THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
THOMAS JACKSON, Defendant-Appellant.

First District (5th Division)    No. 77-261

Opinion filed February 10, 1978.

Ralph Ruebner, of Chicago (Kenneth L. Jones, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Myra J. Brown, and Armand L. Andry, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

After a bench trial, defendant was convicted of the murder of Raymond Archer and sentenced to a term of 14 years to 14 years and a day. He was also convicted of aggravated assault and armed violence of Byron Brady, but was not sentenced for these offenses. On appeal, he submits the following issues for review: (1) whether a bona fide doubt of his fitness existed at trial and at the time of sentencing; (2) whether a reasonable doubt of his sanity existed at the time of the commission of the crimes; (3) whether his aggravated assault conviction should be vacated because it is a lesser included offense of his armed violence conviction; and (4) whether the armed violence conviction should be vacated because of the trial court's failure to impose sentence.

In October 1975, a hearing was held to determine defendant's fitness to stand trial. The only person testifying was Dr. Reifman, a psychiatrist, who gave his opinion that defendant understood the nature of the charges against him but was unable to cooperate with counsel in his defense. Based on this testimony, defendant was found unfit to stand trial and was committed to the custody of the Department of Mental Health. At a second fitness hearing, in April 1976, Dr. Reifman was again the only witness. He testified that defendant's condition was in remission, that he understood the nature of the charges against him, and that with the continued use of medication (a tranquilizer) he could cooperate with his counsel. Defendant was found fit to stand trial, after which he waived a jury and his case was tried simultaneously with the jury trial of codefendants.

The events leading up to the offenses charged involved the theft of defendant's stereo from his girl friend's apartment and his efforts to recover it from Raymond Archer, who was reported to have been seen with it. The estranged wife of Archer, called as a witness for the State, testified that defendant offered her $300 for her husband's phone number; that he threatened to kill her husband and said that if he didn't get him, he would kill her; and that when she refused to give information concerning her husband, defendant kicked her in the back. Defendant admitted asking Mrs. Archer for her husband's address but denied threatening or kicking her. Byron Brady, Archer's brother-in-law, called by the State, testified that earlier on the evening of the murder, defendant came to his apartment and offered him $100 for Archer's address. When Brady denied knowing it, he was forced by defendant (using a gun) to leave and get into defendant's car. Waiting in the car were Randy Gamble and two women. There, defendant held the gun to Brady's head and threatened to kill him if he did not disclose Archer's address. After Gamble restrained defendant, the two women were driven home and, at one of the stops,

Curtis Harris joined the group. Brady, complying with a demand from defendant, telephoned Archer's wife and obtained his address in Evanston, which he gave to defendant. Once in Evanston, defendant asked a police officer for directions to the address of Archer.

Upon arrival there, Brady was forced to accompany defendant to the door with Gamble and Harris. Defendant told him to knock on the door and ask for Archer—who, when he came to the door, was asked by defendant about his stereo. When Archer said he knew nothing about it, Brady testified that defendant grabbed Archer's arm, spun him around, and shot him four times. The three men then ran back to the car and, as they were driving away, Gamble took the gun from defendant and threw it out the window. On their way back, the police stopped their car in Dixmoor, Illinois, and brought them to a police station in that village.

There, Gamble, Harris, and Brady signed written statements identifying defendant as the gunman. Defendant was then advised of and said he understood his *Miranda* rights. He was questioned by Officer Ayres, who testified that defendant said he did not shoot Archer. However, he was later questioned by Officer Hennegan, who testified that defendant admitted shooting Archer four times when Archer said he did not have the stereo. After making this admission, the questioning was terminated because defendant said he wanted to talk to his father concerning hiring an attorney. Investigating officers recovered the heel of a shoe outside defendant's home which was later identified as coming from defendant's shoe, and the handgun which was identified as the one used in the shooting was found by the police not far from Archer's home.

Concerning the shooting, defendant testified at trial that Archer drew a gun during the conversation at his home and, when that happened, he said his "mind snapped" and that he really did not remember who shot Archer. He also testified that he had mental problems since he was a little boy. Defendant's father testified that defendant was under the care of a Dr. Meade, and his sister testified that from her conversations with defendant there seemed to be something wrong with him.

The court, after finding defendant guilty of the three charges, set the sentencing hearing for a later date and ordered a psychiatric fitness report to be submitted prior thereto. At that hearing, defendant's counsel pointed out that defendant had not been examined as ordered and that he had not received his medication prior to the hearing. There had been a presentence report, however, and the court after stating its belief that defendant was fit sentenced him only on the murder conviction.

OPINION

■■ Defendant initially contends that a bona fide doubt of his fitness existed at trial and at the time of sentencing. To require an accused to

stand trial or be sentenced at a time when he is unfit to do so constitutes a denial of due process of law. (*Pate v. Robinson* (1966), 383 U.S. 375, 15 L. Ed. 2d 815, 86 S. Ct. 836; *People v. Salvaggio* (1976), 38 Ill. App. 3d 482, 348 N.E.2d 243.) Under the Unified Code of Corrections (Ill. Rev. Stat. 1975, ch. 38, par. 1005—2—1), the applicable test is the ability to understand the nature of the proceedings and to cooperate with counsel. Consequently, an accused may be tried where prescribed medication is used in order to maintain his fitness. (*People v. DalFonso* (1974), 24 Ill. App. 3d 748, 321 N.E.2d 379.) Whether or not a bona fide doubt of fitness has been raised rests within the discretion of the trial court (*People v. Skorusa* (1973), 55 Ill. 2d 577, 304 N.E.2d 630; *People v. Pridgen* (1967), 37 Ill. 2d 295, 226 N.E.2d 598; *People v. Milligan* (1963), 28 Ill. 2d 203, 190 N.E.2d 753; *People v. Salvaggio*) and, unless there is a clear abuse, the determination that no bona fide doubt of fitness exists will not be reversed on appeal. *People v. DeMary* (1967), 37 Ill. 2d 364, 227 N.E.2d 361; *People v. Johnson* (1976), 36 Ill. App. 3d 871, 344 N.E.2d 602.

In the instant case, at the first fitness hearing a psychiatrist testified that defendant understood the nature of the proceedings but was unable to cooperate with his counsel in his own defense. On this testimony, he was found unfit to stand trial. At a second fitness hearing, six months later, the court found defendant fit after the same psychiatrist testified that defendant understood the charges and that, with medication (tranquilizers), he could cooperate with his counsel.

■■ Defendant does not challenge this finding, but he maintains that a bona fide doubt of his fitness arose at certain stages of the trial. First, he argues he was unfit during the jury selection for the codefendants' trial because he had not been given his medication the night before. We reject this argument since, having previously waived his right to a jury trial, defendant's presence at that time was unnecessary. Also, because this instance of a failure to receive medication occurred five days before his bench trial began, it could not have raised a bona fide doubt as to his fitness when his trial commenced. Furthermore, by defendant's own admission, when this lack of medication was brought to the court's attention, special care was taken to see that defendant was hospitalized each night and given the prescribed medication.

The second stage at which defendant asserts unfitness occurred after the State rested its case when his counsel, in a remark to the court, indicated some difficulty communicating with his client. We see no merit in this contention. At that time, counsel suggested that a mental examination of defendant was appropriate to determine whether, "at the time of the commission of this incident, he was insane and mentally incompetent to comprehend. * * * Now I have been talking to him. One day I get an answer, the next day I get an improper answer * * *."

A trial court has a duty to hold a fitness hearing once facts are brought to its attention which raise a bona fide doubt as to fitness to stand trial. *People v. Thomas* (1969), 43 Ill. 2d 328, 253 N.E.2d 431; *Brown v. People* (1956), 8 Ill. 2d 540, 134 N.E.2d 760.

Here, however, the record does not disclose the nature and extent of the communication problem that may have existed between defendant and his counsel, and we do not believe that this bare statement of his counsel that he had been talking to him and that he would get no answer on one day and an improper answer on the next day raised a bona fide doubt as to defendant's fitness. Furthermore, after the remarks of his counsel, defendant took the stand on his own behalf, and the record discloses that his answers were coherent and responsive.

■■ We do, however, find substance in defendant's argument that the trial court erred in failing to determine whether he was fit to be sentenced. After the court found defendant guilty of the three charges, it scheduled a sentencing hearing a month later and ordered a fitness examination of defendant with the findings to be submitted at the sentencing. When the hearing began, the court was informed that defendant had not been examined as ordered and that, prior to the hearing, he had not received the medication necessary to maintain his fitness. Notwithstanding this, the court imposed the sentence on the murder conviction. Because the court's finding of fitness prior to trial was based upon medical testimony that defendant was able to cooperate with his counsel only while being maintained with the prescribed medication and that at the time of sentencing he had not received his medication, we believe that a bona fide doubt was raised as to his fitness. Our opinion is buttressed by the fact that the court indicated concern in this regard when it ordered the presentence fitness examination.

Defendant also contends that the record contains sufficient evidence of insanity at the time of the offense to require the State to prove defendant sane beyond a reasonable doubt, and he argues that the State did not meet this burden. We disagree.

Insanity is an affirmative defense (Ill. Rev. Stat. 1975, ch. 38, par. 6—4), defined in the Illinois Criminal Code of 1961 as follows:

"(a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

(b) The terms 'mental disease or mental defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct." Ill. Rev. Stat. 1975, ch. 38, par. 6—2.

The law presumes all individuals to be sane. (*People v. Smothers*

(1973), 55 Ill. 2d 172, 302 N.E.2d 324; *People v. Robinson* (1961), 22 Ill. 2d 162, 174 N.E.2d 820, *cert. denied* (1961), 368 U.S. 857, 7 L. Ed. 2d 55, 82 S. Ct. 97; *People v. Lono* (1973), 11 Ill. App. 3d 443, 297 N.E.2d 349.) Once the defense introduces evidence raising a reasonable doubt of defendant's sanity at the time of the commission of the offense (*People v. Redmond* (1974), 59 Ill. 2d 328, 337, 320 N.E.2d 321, 326; *People v. Smothers* (1973), 55 Ill. 2d 172, 174-75, 302 N.E.2d 324, 326), the prosecution must prove his sanity at that time beyond a reasonable doubt (*People v. Sims* (1976), 35 Ill. App. 3d 401, 405, 342 N.E.2d 256, 259; *People v. Felton* (1975), 26 Ill. App. 3d 395, 398, 325 N.E.2d 400, 402).

■■ Although the issue of insanity is usually raised by expert psychiatric testimony or by the testimony of laymen who have had the opportunity to observe defendant and whose opinions are based upon what they have seen, such testimony is not essential where the evidence otherwise portrays serious mental defects or reveals a substantial history of mental illness. *People v. Childs* (1972), 51 Ill. 2d 247, 281 N.E.2d 631; *People v. Lono.*

Defendant testified he had mental problems since he was a small boy and that he did not remember the circumstances of the shooting because his "mind snapped" after the victim had displayed a gun. His father said that defendant was suffering from a "mental disturbance," and his sister stated that he seemed "a little bit different after his stereo was stolen" but that she and her father just "passed it off." A codefendant testified that on the day of the occurrence defendant acted "different" or "queer." Defendant also suggests that his irrational and bizarre behavior at the time of the commission of the offense is indicative of insanity. In this regard, he points to his repeated assurances to the codefendants that he would not harm anyone with the gun, his statement that he would turn Archer over to the police, and the fact that he stopped a police officer for directions to Archer's home and told the officer where he was going, who he was looking for, and where he came from.

■■ We believe that the testimony of defendant and the other witnesses, as outlined above, and the fact that defendant's conduct may have been bizarre, falls way short of portraying the serious mental condition or substantial history of mental illness required by *People v. Childs* and *People v. Lono.* Moreover, as stated in *People v. Horton* (1975), 29 Ill. App. 3d 704, 711, 331 N.E.2d 104, 110:

> "Although it might be justified in one sense to characterize the circumstances of the shooting as 'bizarre,' in the same sense one could characterize most any crime of violence as 'bizarre.' Such an observation does not compel a finding of mental disease or defect sufficient to exonerate one from criminal liability."

Here, from our review of the record, we conclude that defendant failed

to raise a reasonable doubt as to his sanity at the time he committed the criminal acts. *People v. Redmond; People v. Smothers.*

Defendant next argues that aggravated assault is a lesser included offense of armed violence and, thus, that his conviction for aggravated assault should be vacated. He also argues that his conviction for armed violence should be vacated because no sentence was imposed thereon.

Where two separate offenses requiring the same elements of proof are based on a single act of defendant, there can be but one conviction. (*People v. Lilly* (1974), 56 Ill. 2d 493, 309 N.E.2d 1.) Only when more than one offense arises from a series of incidental or closely related acts and the offenses are not by definition lesser included offenses, may convictions with concurrent sentences be entered. *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838.

■■ Defendant was convicted of armed violence and aggravated assault of Byron Brady stemming from his threats to kill Brady. The State concedes that aggravated assault is a lesser included offense of armed violence and that the conviction for that offense should be vacated.

There is a difference of opinion, however, concerning whether the failure to sentence on the armed violence conviction should be vacated. Defendant argues it should be, because the judgment was incomplete; whereas, the State posits that it is merely asking the sentence to be imposed to make the judgment final.

■■ This cleavage has its roots in an apparent conflict of cases decided by this court. In *People v. Jones* (1976), 40 Ill. App. 3d 850, 353 N.E.2d 375, the court regarded a conviction without a sentence to be an incomplete judgment and held it should be vacated. In *People v. Johnson* (1977), 46 Ill. App. 3d 365, 360 N.E.2d 1314, the court viewed the State's request to impose sentence as one for the entry of a final judgment when one was lacking and remanded the case for sentencing. In *People v. Akins* (1976), 43 Ill. App. 3d 943, 358 N.E.2d 3, the court regarded the State as having placed itself in the posture of an appellant by raising the failure to impose sentence as an issue in defendant's appeal and held the State had no right to request vacatur because the conviction would stand without a sentence. It appears to us, however, that the problem was solved in *People v. Scott* (1977), 69 Ill. 2d 85, 370 N.E.2d 540, where the defendant was convicted of rape, armed robbery, aggravated battery, and aggravated kidnapping. The trial court, however, did not impose a sentence on the aggravated kidnapping conviction, and the question presented for review was whether the appellate court was empowered to remand for the imposition of a sentence for that conviction. It was held that the appellate court acted within the scope of its powers in remanding. The court reasoned: "The effect of the remanding order for

the imposition of sentence is to complete the circuit court's order and render the judgment final." 69 Ill. 2d 85, 89, 370 N.E.2d 540, 542.

Summarizing, we have found that a reasonable doubt of sanity was not raised; that there was no bona fide doubt as to defendant's fitness during the trial, but there was at the time of sentencing; that the conviction for aggravated assault should be vacated; and that the conviction for armed violence should not be vacated.

Accordingly, the convictions for murder and armed violence are affirmed; the conviction for aggravated assault is vacated; and this matter is remanded with directions to conduct a hearing for resentencing on the murder conviction and for resentencing on the armed violence conviction.

Affirmed in part; vacated in part; and remanded with directions.

MEJDA and WILSON, JJ., concur.