THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
JESUS MARTINEZ, Defendant-Appellant.

First District (4th Division)    No. 78-1870

Opinion filed November 15, 1979.

James J. Doherty, Public Defender, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Linda Dale Woloshin, and Nancy Linn Martin, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LINN delivered the opinion of the court:

At the conclusion of a bench trial before the circuit court of Cook County, defendant, Jesus Martinez, was convicted of attempt murder of two police officers (Ill. Rev. Stat. 1973, ch. 38, par. 8—4), and was sentenced to a prison term of 4 to 8 years. On appeal defendant contends: (1) the trial court erred in denying his motion for a new trial because a bona fide doubt as to his fitness to stand trial did exist; and, (2) the State failed to prove that he was guilty beyond a reasonable doubt of attempt murder.

We affirm the trial court's denial of the defendant's motion for new trial and we affirm the defendant's attempt murder conviction.

The State's evidence discloses that on April 8, 1974, Ramone Souchet, manager of the La Concha Club (the club), refused to admit defendant into the club because a private meeting was in progress. Defendant left the club telling Souchet that he would return. Fifteen minutes later, defendant returned, exhibited a shotgun and directed a woman at the door to locate Souchet. Upon learning of defendant's return, Souchet solicited the assistance of two off-duty police officers, who accompanied him outside the club. They observed defendant park his car in the alley next to the club.

At defendant's request, Souchet approached defendant's car and talked with him. Standing a foot away from the car, Souchet saw defendant's shotgun on the front seat. Souchet called to the officers. The police officers approached the car and identified themselves to the defendant. One officer had drawn his gun. Although the officers told defendant he was under arrest, the defendant sped away in the car.

Several minutes later, defendant returned and slowly drove past the front of the club, pointing the shotgun at Souchet and the officers who were standing 10 to 15 feet away. As Souchet and the officers took cover, defendant again drove away. Souchet left the officers to call for additional help. A few minutes later, defendant returned once more, driving slowly past the club. The officers, standing in an alley next to the club and some 10 to 15 feet from the defendant's car, saw defendant pointing the shotgun at them through the car window. As the officers dropped to the ground, they heard a shot fired. Defendant then drove away. A few days later defendant was arrested.

After the State rested, defendant, the only witness for the defense, took the stand. On direct examination, he denied shooting the shotgun, but on cross-examination admitted to the shooting. At the close of the arguments, the court found defendant guilty of attempt murder. Thereupon, counsel for the defendant moved for a behavioral clinic examination of the defendant to determine defendant's mental fitness to be sentenced, premised on defendant's sudden change in testimony on

cross-examination wherein defendant acknowledged having fired the shotgun. The trial judge allowed the motion and ordered the director of the Illinois State Psychiatric Institute, or one of his assistants, to examine defendant and report to the court.

On March 17, 1975, Dr. Robert Reifman, assistant director of the Illinois State Psychiatric Institute, submitted a written report to the court concluding that defendant was not mentally fit to participate in a hearing in aggravation, mitigation, and sentencing. On March 27, 1975, defense counsel moved the court to order another examination to determine if defendant was mentally fit to stand trial at the time trial was commenced.

On April 2, 1975, Dr. Reifman reported to the court in writing that based upon his examination at that point in time, it was impossible to determine whether defendant had been mentally fit at the time of trial.

On April 25, 1975, pursuant to defense counsel's additional petition, a further hearing on defendant's competency at the time of trial and now at the time of sentencing was conducted. Dr. Reifman testified that based on his examination of defendant and his subsequent diagnosis of the defendant as suffering from a schizophrenic reaction and being a paranoid type, defendant was not mentally fit to be sentenced. However, Dr. Reifman asserted he could not determine retrospectively whether defendant was mentally fit at the time of trial because defendant's present illness prevented him from communicating adequately with the defendant so as to pinpoint the onset of the defendant's illness or to discover whether defendant understood the nature of the trial proceedings or ould cooperate in his defense. Dr. Reifman acknowledged that a review of the trial transcript, in addition to his examination, would be insufficient as a basis upon which to determine defendant's fitness to have stood trial since the diagnosis still would be retrospective, "which is always subject to gross error. It is not accurate."

Dr. Reifman further testified that while he was presently unable to render an opinion as to defendant's mental fitness at the time of trial, he had examined defendant on October 23, 1974, almost four months prior to trial and, at that time, found that the defendant understood the nature of the charges and that he could cooperate with counsel and was then fit to stand trial.

At the close of the April 25, 1975, hearing, the trial court found defendant in need of mental treatment and committed him to the Department of Mental Health until such time as he became competent to participate in a hearing on sentencing. No finding was made as to defendant's mental fitness at the time of trial.

During the next two years, while the defendant was committed to the Department of Mental Health, defendant was examined several times to

ascertain his sanity at the time he committed the offense and his mental fitness to stand trial. He also was examined periodically to determine whether he was mentally competent to participate in a sentencing hearing.

On February 4, 1976, pursuant to court order, the defendant was again examined, by Dr. Reifman, who, in a letter to the court on that same day, reported that in his judgment defendant now was mentally fit to participate in a sentencing hearing.

On February 27, 1976, at defendant's counsel's request, the court again ordered an examination as to defendant's sanity and mental fitness at the time of trial. On March 12, 1976, Dr. Reifman submitted a written report to the court concluding that defendant was mentally fit to participate in a sentencing hearing. However, Dr. Reifman again contended that he was unable to render an opinion as to defendant's state of mind at the time of the offense or at the time of trial.

On April 2, 1976, defense counsel filed a petition for defendant's restoration and the court, after a hearing, entered a judgment finding that defendant was then mentally fit. That same day, pursuant to request of defense counsel, the court ordered a private psychiatrist's examination of defendant to determine defendant's mental condition at the time of the offense and at trial and his present fitness to participate in a sentencing hearing. Dr. Werner Tuteur, a private psychiatrist, examined defendant on May 28, 1976, and on August 20, 1976, filed his written report with the court. Dr. Tuteur concluded that defendant's condition of schizophrenia was in remission, and therefore he was mentally fit to participate in a sentencing hearing. He also concluded that defendant was mentally fit at the time of trial. He gave no opinion as to defendant's sanity at the time of the offense.

On July 22, 1976, and prior to the filing of Dr. Tuteur's report, the court again ordered another competency examination of the defendant through the Illinois State Psychiatric Institute. On August 5, 1976, Dr. Reifman responded by letter that defendant was again not fit to be sentenced because he could not cooperate with counsel due to his schizophrenia. Accordingly, on August 20, 1976, the court found defendant unfit for sentencing and on September 28, 1976, a new petition for hospitalization of defendant was filed.

At defendant counsel's further request, on December 22, 1976, the court again ordered defendant's examination. Dr. Reifman once more determined that defendant was mentally unfit for sentencing.

Almost a year later, on November 14, 1977, the assistant superintendent of Chester Mental Health Center forwarded a psychiatric report to the court in anticipation of the court's yearly review of defendant's

clinical status. The report concluded that defendant then understood the nature of the sentencing hearing and that he could cooperate with counsel.

On November 23, 1977, Dr. Reifman again examined defendant at the request of the court. He ascertained that defendant was mentally fit to participate in a sentencing hearing because defendant understood the purpose of the proceeding and could cooperate with counsel.

On February 15, 1978, pursuant to defense counsel's request for a restoration hearing, the court ordered another examination to determine defendant's sanity at the time of the offense. Dr. Gerson Kaplan, a staff psychiatrist at the Illinois State Psychiatric Institute, responded by letter dated February 28, 1978, that his examination revealed defendant was then mentally fit but that he could not determine defendant's mental status at the time of the commission of the crime.

The record does not disclose the court's ruling on the restoration petition. However, on April 6, 1978, a hearing on post-trial motions and sentencing was held. Defendant argued that a new trial was required because a bona fide doubt as to his mental fitness to stand trial had existed at the time of his trial. The trial judge in ruling on the motion for a new trial stated:

> "I can certainly say for the record that Jesus Martinez certainly on the day of the trial and at the time he appeared before this Court was asked whether he gave up his right to a trial by a jury and he answered. I know he was well on that day. He appeared very well before the Court. He appeared well before the Court on the day of the actual proceedings of trial where the witnesses testified and he sat at the table with his lawyer and he listened to the testimony of the witnesses and conferred with his lawyer throughout the entire trial. Then he took the stand and he testified on the stand himself. His answers were responsive to the questions that were made at the time; and insofar as testimony of this witness was given at the trial, I at no time really felt there was ever any question of his mental competency during the trial itself. If there was, I would have stopped the entire trial and impaneled a jury just as Mr. Gembela stated."

The court denied defendant's motion for a new trial.

OPINION

I

Defendant contends that at the time of trial in 1975, there was a bona fide doubt as to his fitness to stand trial and, therefore, the trial court should have granted his post-trial motion for a new trial. "Fitness for trial" as defined under the Unified Code of Corrections requires that the

defendant have: (1) the ability to understand the nature and purpose of the proceedings; and (2) the ability to assist in his defense. Ill. Rev. Stat. 1977, ch. 38, par. 1005—2—1(a)(1), (2); *People v. Murphy* (1978), 72 Ill. 2d 421, 431, 381 N.E.2d 677, 682; *People v. Foley* (1963), 28 Ill. 2d 426, 427, 192 N.E.2d 850, 851.

■■ The question of fitness may be raised before or during trial by the State, the defendant, or the court (Ill. Rev. Stat. 1977, ch. 38, par. 1005—2—1(b)), and "when a bona fide doubt of the defendant's fitness to stand trial * * * is raised" (Ill. Rev. Stat. 1977, ch. 38, par. 1005—2—1(c)), a duty devolves upon the court to order a determination of that question before continuing the proceedings. Whether or not a bona fide doubt of mental fitness has been raised rests within the discretion of the trial court. (*People v. Murphy* (1978), 72 Ill. 2d 421, 431, 381 N.E.2d 677, 682; *People v. Skorusa* (1973), 55 Ill. 2d 577, 582, 304 N.E.2d 630, 633; *People v. Jackson* (1978), 57 Ill. App. 3d 809, 813, 373 N.E.2d 583, 586.) Absent a clear showing of abuse of discretion, this determination will not be reversed on appeal. *People v. Jackson* (1978), 57 Ill. App. 3d 809, 813, 373 N.E.2d 583, 586, citing *People v. DeMary* (1967), 37 Ill. 2d 364, 227 N.E.2d 361, and *People v. Johnson* (1976), 36 Ill. App. 3d 871, 344 N.E.2d 602.

The determination of whether there is a bona fide doubt of fitness for trial depends on the facts of each case. (See *People v. Murphy* (1978), 72 Ill. 2d 421, 431, 381 N.E.2d 677, 684.) The critical inquiry, then, is whether the facts in the instant case presented a bona fide doubt that defendant understood the nature and purpose of the proceedings and was able to assist in his defense. In examining this issue, we recognize that the trial court, unlike this reviewing court, was in a position to observe the defendant first hand and evaluate his conduct and mental state. *People v. Murphy* (1978), 72 Ill. 2d 421, 431, 381 N.E.2d 677, 682; *People v. Dudley* (1970), 46 Ill. 2d 305, 309-10, 263 N.E.2d 1, 4.

The defendant suggests that a bona fide doubt as to his fitness to stand trial was exposed dramatically to the court when the defendant, on cross-examination, acknowledged that he had indeed fired the shotgun whereas on direct examination, he had denied so doing. The defendant infers that such a change in his testimony, which he suggests must have inalterably led to his conviction, clearly indicated a serious flaw in the defendant's mental processes so as to raise a substantial doubt as to his mental competency to stand trial. Further, defendant contends that the trial court's immediate granting of defense counsel's motion for a competency hearing as to the defendant's mental fitness to participate in a sentencing hearing is evidence of the court's own doubt of the defendant's mental state and his mental fitness to have stood trial. Consequently, defendant argues a bona fide doubt as to his understanding of the nature

of the proceedings and his ability to assist in his defense had been raised, and that the State then had the burden of showing defendant's fitness to stand trial—and this the State failed to do.

■▌ It is not unusual, under the vigors of cross-examination, for a witness to alter substantially the testimony given by him on direct examination. The very nature of the cross-examination process is to weaken the credibility of the witness. We find nothing in the direct and cross-examination testimony as disclosed in the record of this case that indicates any significant relationship between the change in the defendant's testimony and the charge that a doubt as to his competency to stand trial was thereby created.

Further, we believe the evidence in the record before us amply supports the trial court's conclusion that defendant understood the nature of the proceedings and was able to assist in his defense. The trial judge explained that his determination of competency was based upon the court's observation and evaluation of defendant's conduct prior to and during trial. The court specifically stated that defendant conferred with counsel throughout the trial and answered questions responsively during his testimony, all of which indicated defendant's awareness of the charge against him and his ability to cooperate with his counsel.

■▌ Prior to trial, the trial judge questioned defendant to determine his understanding of the significance of his waiver of trial before a jury. Defendant's responses indicated no difficulty of understanding, nor did defense counsel contend that any difficulty existed. Further, the record discloses that both prior to and during trial, defendant's answers were lucid, coherent, and responsive. We cannot say that defendant's conduct during trial raised any bona fide doubt as to his mental fitness to stand trial. See *People v. Jackson* (1978), 57 Ill. App. 3d 809, 814, 373 N.E.2d 583, 587; *People v. Richardson* (1978), 61 Ill. App. 3d 718, 727, 377 N.E.2d 1235, 1242; *People v. Carter* (1974), 16 Ill. App. 3d 842, 845-46, 306 N.E.2d 894, 896.

Nor can we conclude that the trial court's ordering of a competency hearing to determine the defendant's fitness to participate in a sentencing proceeding does, by itself, raise a bona fide doubt as to the competency of the defendant to have stood trial. See *People v. Pierce* (1977), 50 Ill. App. 3d 525, 528, 365 N.E.2d 988, 990.

In *People v. Pierce* (1977), 50 Ill. App. 3d 525, 365 N.E.2d 988, a case factually analogous to the one here, the defendant waived a jury trial and subsequently, the court found him guilty of attempt murder. Immediately thereafter, and prior to sentencing, the trial judge, *sua sponte*, ordered a behavioral clinic examination to determine the defendant's competency. Defendant was examined some 20 days later, and found to be mentally unfit to participate in a sentencing hearing. The examining psychiatrist

had no opinion as to defendant's competency at the time of trial. The trial court found defendant unfit to be sentenced and committed him to the Department of Mental Health. About a year later, defendant was restored and was thereafter sentenced to prison.

On appeal, this court rejected defendant's argument that on the day he waived trial by jury and agreed to a bench trial there was sufficient doubt of his competency to stand trial, and that a competency examination should have been ordered by the court. The defendant contended that he did not knowingly waive the right to a jury trial. This court there determined that although the trial court, immediately after finding defendant guilty, ordered an examination to determine the defendant's competency to participate in a sentencing proceeding, this fact alone did not raise a bona fide doubt as to defendant's fitness to stand trial. *People v. Pierce* (1977), 50 Ill. App. 3d 525, 528, 365 N.E.2d 988, 990.

The rationale and holding articulated in *Pierce* apply with equal force to the case at bar. As in *Pierce*, defendant testified with apparent competency. His counsel did not complain that the defendant could not assist in his defense. Similarly, defendant here had never been psychiatrically hospitalized prior to trial. We necessarily conclude that, absent other indications of unfitness, no bona fide doubt as to defendant's fitness to stand trial arose by the mere fact that the trial court, immediately after finding defendant guilty, granted defendant's request for a competency examination to determine defendant's fitness to participate in a sentencing hearing.

Nor does it follow that there was a bona fide doubt of defendant's fitness to stand trial in consequence of the examining psychiatrist concluding but 20 days after trial that the defendant was unfit to participate in a sentencing hearing. Indeed, the Uniform Code of Corrections recognizes that a defendant may be mentally fit at different times and provides for the raising of the issue of mental fitness before or during trial as well as after judgment and before sentencing. Ill. Rev. Stat. 1977, ch. 38, par. 1005—2—1(b).

Defendant relies heavily upon *Pate v. Robinson* (1966), 383 U.S. 375, 15 L. Ed. 2d 815, 86 S. Ct. 836. However, the bona fide doubt issue raised before trial in *Robinson* is absent here. There, the defendant had a history of pronounced irrational behavior. He had suffered a blow to the head as a child and thereafter exhibited aberrant behavior. He was treated for paranoid behavior as an inpatient at a psychiatric hospital. He shot and killed his son and then shot himself in the head. Four years later, after release from prison, he killed his girlfriend. Such serious misbehavior, evidencing irrational thinking and conduct, is absent in the case at bar. Thus, *Robinson* is distinguishable on the facts.

Similarly, defendant's reliance on *People v. McCullum* (1977), 66 Ill.

2d 306, 362 N.E.2d 307, is misplaced. Defendant asserts that the State had the burden of proving that the defendant was fit for trial. This burden arises, however, only when first a bona fide doubt as to fitness is raised. (66 Ill. 2d 306, 314, 362 N.E.2d 307, 311.) Where, as here, no bona fide doubt as to defendant's fitness to stand trial was raised, the State had no duty to prove the defendant was fit to stand trial.

Accordingly, we conclude that under the facts and circumstances presented here, the concerned and able trial court did not abuse its discretion in finding that no bona fide doubt as to defendant's fitness at trial had been raised.

II

Defendant also contends that the State failed to prove beyond a reasonable doubt that he intended to kill the two officers when he discharged the shotgun and thus the attempt murder conviction should be reversed. We disagree.

Material elements of the offense of attempt murder are: (1) the performance of "any act which constitutes a substantial step toward the commission" of murder (Ill. Rev. Stat. 1977, ch. 38, par. 8—4(a)), and (2) the specific intent to take a human life. See *People v. Harris* (1978), 72 Ill. 2d 16, 27, 377 N.E.2d 28, 33.

■■ Intent seldom can be proved by direct evidence; it may be deduced or inferred by the trier of fact from the acts committed and the circumstances surrounding the acts. (*People v. Heaton* (1953), 415 Ill. 43, 46, 112 N.E.2d 131, 132; *People v. Thomas* (1978), 60 Ill. App. 3d 673, 676, 377 N.E.2d 195, 198.) Thus, the specific intent to take a life may be inferred from the character of the assault, the use of a deadly weapon, and other circumstances. *People v. Shields* (1955), 6 Ill. 2d 200, 205, 127 N.E.2d 440, 443; *People v. Thomas* (1978), 60 Ill. App. 3d 673, 676, 377 N.E.2d 195, 198.

■■ In this case, defendant pointed a gun at the two police officers on two separate occasions. During cross-examination, he admitted that he fired the gun during the second confrontation. We believe that the trial court could infer defendant's intent to kill from these acts. One is presumed to intend the natural and probable consequences of his actions. (*People v. Masterson* (1967), 79 Ill. App. 2d 117, 127, 223 N.E.2d 252, 257.) We find that the evidence supports the court's determination that defendant intended to cause death or serious harm in shooting a shotgun in the direction of the two officers. See *People v. Nickolopoulos* (1962), 25 Ill. 2d 451, 454, 185 N.E.2d 209, 210; *People v. Payton* (1971), 2 Ill. App. 3d 693, 697, 276 N.E.2d 775, 778.

■■ We also note that although defendant denied aiming the gun directly at the officers with the intent to kill them, it was the trial court's

prerogative, as trier of fact, to disbelieve defendant's testimony as to his state of mind. (*People v. Thorns* (1978), 62 Ill. App. 3d 1028, 1031, 379 N.E.2d 641, 643; *People v. Lofton* (1977), 49 Ill. App. 3d 559, 561, 364 N.E.2d 584, 586.) We will not disturb the trial court's conclusion.

For the reasons given, we affirm the conviction.

Affirmed.

JIGANTI, P. J., and JOHNSON, J., concur.