THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CARL LUCAS, Defendant-Appellant.
Second District   No. 2—82—0446

Opinion filed January 8, 1986.

G. Joseph Weller and Robert Hirschhorn, both of State Appellate Defender's Office, of Elgin, for appellant.

Robert M. Morrow, State's Attorney, of Geneva (Phyllis J. Perko and William L. Browers, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE HOPF delivered the opinion of the court:

Defendant, Carl Lucas, was charged by indictment with rape (Ill. Rev. Stat. 1979, ch. 38, par. 11—1(a)); deviate sexual assault (Ill. Rev. Stat. 1979, ch. 38, par. 11—3(a)), attempted murder (Ill. Rev. Stat. 1979, ch. 38, par. 8—4(a)), and armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 18—2(a)). A jury found defendant guilty of armed robbery, aggravated battery, deviate sexual assault, and rape. Judgment was entered on those verdicts, and defendant was subsequently sentenced to 16 years' imprisonment. A timely notice of appeal was filed.

In this court defendant raises four issues which we choose to treat as three: (1) whether the trial court abused its discretion in determining that no *bona fide* doubt existed as to defendant's fitness to stand trial; (2) whether the defendant's suppression motions were improperly denied; and (3) whether the trial court's handling of an alleged discovery violation constituted reversible error.

For the sake of brevity, we will summarize those facts necessary to provide a background for the issues raised on appeal and discuss other facts as they are pertinent to the arguments raised herein.

Prior to trial, the defense moved for the appointment of experts to evaluate defendant's fitness to stand trial. The court ordered that defendant be evaluated by the Kane County Diagnostic Center (Center). At a subsequent hearing conducted to assess whether a *bona fide* doubt existed as to defendant's fitness, the testimony of Roger Hughes, a staff psychologist with the Center, revealed his evaluation of defendant as a result of three tests which Hughes had administered to defendant: the Wechsler Adult Intelligence Scale—Revised, the Raven Progressive Matrices, and the Bender Visual-Motor Gestalt Test. The test results suggested that defendant's verbal, nonverbal, and conceptual abilities were generally impaired, meaning that 95% of the population in defendant's age group (17 years old) performed better on these tests than defendant did.

According to Hughes, defendant possessed an I.Q. of 72, which placed him in the borderline mental defective area, the least severe form of mental retardation. Hughes admitted on cross-examination that based on the most recent Diagnostic and Statistical Manual (DSM 3), a recognized treatise in the fields of psychology and psychiatry, mental retardation was cut off at 70. The witness acknowledged that defendant could perform some work under supervision and that, as an adult, he could achieve social and vocational skills adequate for minimal self-support. Hughes did not specifically opine whether defendant was fit or unfit to stand trial.

Dr. Alan Rosenwald, a clinical psychologist, testified that his ini-

tial evaluation of defendant was based on an interview he conducted with defendant. As a result of his clinical evaluation, Rosenwald diagnosed defendant as at a borderline mental retardation level. In a written report of this evaluation Rosenwald described defendant as "fit." At the hearing the witness retracted this finding, explaining that when he had used the word "fit," he was referring to defendant's ability to engage in simple conversation with the witness. Additionally, Rosenwald stated that there are relative degrees of fitness, that defendant was fit only within a very limited sense, and that perhaps he should not have used the word "fit." Rosenwald's testimony revealed that he was experienced in making fitness evaluations and that he was very familiar with the fitness statute (Ill. Rev. Stat. 1981, ch. 38, par. 104–10) and the legal definition of "fitness" therein. The witness also stated that he knew he was to evaluate defendant's fitness to stand trial.

The State moved for a directed finding, arguing that defendant had not met his burden in raising a *bona fide* doubt as to defendant's fitness. After hearing arguments and reviewing cases submitted by both parties, the trial court granted the State's motion.

Concurrent with the fitness motion were defendant's motions to suppress both a photographic and a physical identification and the fruits of these identifications. At hearings conducted on the motions, various police officers and investigators testified as to the conditions under which defendant was photographed and subsequently asked to appear in a physical lineup. The testimony revealed that, at all times, the officers made it clear that defendant did not have to accompany them to the police station, that he did not have to consent to being photographed, that he did not have to consent to appear in a physical lineup, and that he could have an attorney present at the time of the lineup, if he so desired. The witnesses related that they made certain defendant understood his rights, often restating them in simple terms and asking defendant to explain the rights back to them.

In making its findings on defendant's motions to suppress, the court emphasized that the common factor in these motions, as well as in all others before the court, was defendant's mentality and his ability to understand. The court pointed out that it had already previously ruled on this factor. Having thus commented, the court found nothing improper in the activity of the police officers and, consequently, no deprivation of defendant's lawful rights. Accordingly, the court denied the suppression motions.

At trial, defendant moved to strike the testimony of the State's witness, Mohammed Tahir, an expert serologist, when it was revealed

on cross-examination that one of the tests run on the blood samples taken from a blood-stained shirt seized from defendant was not included in Tahir's report tendered to defense counsel pursuant to discovery. Defense counsel was given a recess and Tahir's handwritten notes on the test run, but not reported, in order to permit counsel to discuss the notes by phone with defendant's expert in California. Dr. Tahir offered to phone defendant's expert to explain tests performed and to answer any questions the expert might have. Additionally, the State stated that it would hold Tahir for the remainder of the week or the following week, if necessary, to permit defendant to complete his cross-examination, although Tahir was scheduled to leave town by the following morning. Defense counsel ignored these offers, repeating that Tahir's testimony should be stricken or cut off. The court denied the motion to strike Tahir's testimony and then asked defense counsel if he wanted to accept the State's offers. Defense counsel rejected the offers, stating he had no further questions under the circumstances.

At the conclusion of the trial defendant was found guilty of armed robbery, aggravated battery, deviate sexual assault, and rape. The jury was hung on the attempted murder count. The court declared a mistrial as to that count, accepted the verdicts on the other counts, and subsequently sentenced defendant to 16 years' incarceration. This appeal followed.

■ Defendant first contends that the trial court abused its discretion in determining that no *bona fide* doubt existed as to defendant's fitness to stand trial. To stand trial a defendant must have the ability to understand the nature and purpose of the proceedings against him and the ability to assist in his defense. (Ill. Rev. Stat. 1983, ch. 38, par. 104—10.) The issue of defendant's fitness may be raised before, during, or after trial by the defense, the State, or the court (Ill. Rev. Stat. 1983, ch. 38, par. 104—11(a); *People v. Martinez* (1979), 78 Ill. App. 3d 590, 595, 396 N.E.2d 1359), but a defendant is not entitled to a fitness hearing until the trial court receives notice of facts which raise a *bona fide* doubt as to his fitness to stand trial. (*People v. McCullum* (1977), 66 Ill. 2d 306, 312, 362 N.E.2d 307.) Whether a *bona fide* doubt has been raised rests within the discretion of the trial court (*People v. Martinez* (1979), 78 Ill. App. 3d 590, 595, 396 N.E.2d 1359), and its determination will not be disturbed absent a clear showing of an abuse of discretion. *People v. Willis* (1978), 64 Ill. App. 3d 737, 740, 381 N.E.2d 799.

Three months after defendant was charged, defense counsel moved to have defendant's fitness to stand trial evaluated by the Kane County Diagnostic Center. The motion was granted, and the

written report of Dr. Alan Rosenwald, a clinical psychologist, was subsequently filed with the court. That report indicated defendant was fit. In spite of Rosenwald's appraisal of defendant, defense counsel sought a hearing to assess whether or not a *bona fide* doubt of defendant's fitness existed. Counsel apparently believed that Rosenwald's written report was "internally inconsistent" and that Rosenwald intended to change his opinion. The court held a hearing at which Roger Hughes, a staff psychologist, and Dr. Alan Rosenwald, both of the Kane County Diagnostic Center, testified. As a result of this hearing, the trial court ruled that no *bona fide* doubt existed as to defendant's fitness to stand trial. Defendant maintains that the trial court abused its discretion in reaching this determination.

Additionally, defendant maintains that the trial court employed an incorrect standard in analyzing the existence of a *bona fide* doubt. Defendant posits that the court's oral ruling indicates that the court recited the ultimate standard of fitness when it stated that the evidence did not show defendant to be unfit. Defendant argues that, in so stating, the court invoked the ultimate standard of fitness, prior to holding a fitness hearing, and thereby shifted the burden of proof on defendant's fitness from the prosecution to the defense.

In response, the State first argues that this issue of alleged burden-shifting was never raised by defense counsel at the hearing to assess whether or not a *bona fide* doubt of defendant's fitness existed, nor was it specifically raised in defendant's written post-trial motion, and, therefore, the issue should be deemed waived. (*People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856; *People v. Pallardy* (1981), 93 Ill. App. 3d 725, 729, 417 N.E.2d 851.) We, however, believe that despite defendant's failure to raise the issue of an allegedly improper standard at the hearing or in his post-trial motion, the error relates to a substantial right, the determination of defendant's fitness to stand trial and, therefore, we take cognizance of it under the plain error rule. 87 Ill. 2d R. 615(a).

Secondly, the State contends that if the alleged error is not deemed waived, the trial court's rulings, viewed in their proper perspective, clearly showed that the court did not improperly shift the burden of proof. We are in agreement with this contention.

The hearing at which Hughes and Rosenwald testified was not a fitness hearing but a hearing designed to assess whether a *bona fide* doubt of defendant's fitness existed. Thus, as the State points out, the State did not possess the ultimate burden of proving defendant's fitness at this hearing because that burden does not arise until after a finding of a *bona fide* doubt of fitness. (*People v. McCullum* (1977), 66

Ill. 2d 306, 314, 362 N.E.2d 307; *People v. Martinez* (1979), 78 Ill. App. 3d 590, 598, 396 N.E.2d 1359.) The fact that the court stated it could not find the defendant unfit to stand trial does not establish that the court was invoking the ultimate standard of fitness, prior to holding the fitness hearing, as defendant would like this court to believe. It is evident from the trial court's remarks preceding this statement that the court's determination related directly to the State's motion for a directed finding of no *bona fide* doubt. We believe, therefore, that it cannot be said that the trial court considered an inappropriate standard. The record contains no specific indication that the court's decision was based on the burden of proof, and the written order specifically refers to no finding of *bona fide* doubt. In our opinion, the record, taken as a whole, does not support defendant's contention that the court ruled on the wrong question, *i.e.*, defendant's fitness rather than the existence of doubt as to fitness. As it did not rule on the ultimate question of defendant's fitness, defendant's argument regarding an inappropriate standard is meritless.

Defendant's contention that the trial court abused its discretion in ruling that no *bona fide* doubt existed is also not supported by the record. Illinois courts have generally found that no single factor in itself raises a *bona fide* doubt of a defendant's fitness to stand trial (*People v. Davenport* (1980), 92 Ill. App. 3d 244, 246, 416 N.E.2d 17), and even though a defendant is classified as in the borderline mentally retarded range, this evidence of his limited intellectual ability does not make him incompetent to stand trial. (See *People v. Holman* (1983), 115 Ill. App. 3d 60, 65, 450 N.E.2d 432; *People v. Willis* (1978), 64 Ill. App. 3d 737, 741, 381 N.E.2d 799.) In fact, a defendant may be fit even though his mind may be otherwise unsound (*People v. Murphy* (1978), 72 Ill. 2d 421, 433, 381 N.E.2d 677), or he is taking medication to keep him in touch with reality (*People v. Dalfonso* (1974), 24 Ill. App. 3d 748, 750-51, 321 N.E.2d 379), or he suffers from some mental disturbance or requires psychiatric treatment (*People v. Davis* (1978), 65 Ill. App. 3d 580, 589, 382 N.E.2d 594). Here, defendant merely possessed a low I.Q.

Whether there is a *bona fide* doubt of fitness for trial depends on the facts of each case. (*People v. Murphy* (1978), 72 Ill. 2d 421, 435, 381 N.E.2d 677; *People v. Martinez* (1979), 78 Ill. App. 3d 590, 595, 396 N.E.2d 1359.) The critical inquiry is whether the facts presented a *bona fide* doubt that defendant understood the nature and purpose of the proceedings against him and was able to assist in his defense. (78 Ill. App. 3d 590, 595, 396 N.E.2d 1359.) Here, the facts showed that one expert, Hughes, who performed three tests on defendant,

made no specific finding regarding defendant's fitness. His testimony showed that defendant's verbal, nonverbal, and conceptual abilities were impaired to the extent that 95% of the population of his age group would perform better in these areas and that defendant possessed an I.Q. of 72, not low enough to be technically considered mentally retarded, but low enough to be considered borderline. Nevertheless, Hughes indicated that he had no difficulty in communicating with defendant and that defendant was able to understand and follow Hughes' directions.

Defendant's other witnesses, Dr. Alan Rosenwald, classified defendant as "fit," as a result of an interview he conducted with defendant. Despite testimony that he had been directly involved in 50 to 100 fitness evaluations, indirectly involved in numerous others, and was very familiar with the fitness statute and the legal definition of fitness, Rosenwald stated that his classification of defendant as "fit" did not refer to defendant's legal fitness but rather to his ability to engage in simple conversation. This was Rosenwald's testimony, even though he later admitted that he knew he was evaluating defendant for his fitness to stand trial.

Further, Rosenwald's testimony showed that although he believed defendant would have extreme difficulty in comprehending the complexities of court proceedings, defendant could testify and be cross-examined with the simplest kinds of questions, could cooperate with his lawyer within the limits of his intellectual ability, could understand the difference between a guilty and nonguilty plea if explained in simple terms, and could provide alibi information to counsel. In fact, the witness related that he had had no difficulty in following defendant's story of claimed innocence.

In our opinion the testimony of the psychologists, in particular that of Dr. Rosenwald, did not support defendant's claim that these expert evaluations gave rise to a *bona fide* doubt as to defendant's understanding of the nature of the proceedings and his ability to assist in his defense. Moreover, the ultimate issue as to whether a *bona fide* doubt of fitness existed rested with the trial court and not with the experts. (*People v. Bilyew* (1978), 73 Ill. 2d 294, 302, 383 N.E.2d 212.) The court was required to analyze and evaluate the factual bases for the experts' opinions rather than relying on the ultimate opinions themselves. (*People v. Bilyew* (1978), 73 Ill. 2d 294, 302, 383 N.E.2d 212; *People v. Jackson* (1980), 91 Ill. App. 3d 595, 414 N.E.2d 1175.) That the court considered these factual bases rather than the ultimate opinions is evident from the court's ruling, wherein it rejected Rosenwald's change of opinion regarding defendant's fitness and con-

cluded that, despite defendant's less than normal intelligence, he possessed the qualities necessary to make him fit for trial.

In this court's view, the trial judge's comments and subsequent written order illustrate his belief that there existed no *bona fide* doubt of defendant's fitness to stand trial. Under the facts and circumstances of this case, we conclude that the trial court was correct and that it did not abuse its discretion in finding that no *bona fide* doubt had been raised.

■ Defendant next contends that the trial court erred in denying defendant's motions to suppress both a photographic and physical identification since the evidence failed to establish that an intelligent waiver of his rights or informed consent existed at the time defendant agreed to be photographed and to participate in a physical lineup. To support his claim that he lacked the intellectual ability to give his consent or waive his rights, defendant again focuses on his low mental capacity.

However, as the State points out, this emphasis on defendant's alleged inability to consent ignores the fact that the trial court, in denying defendant's suppression motions, specifically made mention of defendant's mentality, his ability to comprehend, and the court's prior ruling regarding "the unfitness matter." These statements by the court were immediately followed by its finding that nothing in the activity of the officers involved in the photographic and physical identification processes was improper nor deprived defendant of any lawful rights. We believe it is apparent from the court's ruling that the court considered the defendant's mentality in making its finding and that it concluded that defendant's mentality did not preclude him from possessing the consensual capacity to partake in the photographic and physical identification processes.

Furthermore, we believe the record supports the court's denial of the defendant's suppression motions. The record shows that at the time defendant was initially picked up by officers investigating the offenses in question, defendant was told that he was not under arrest, that he did not have to accompany the officers to the station, and that he did not have to talk to the officers. Nothing in the objective behavior of the police could have compelled the defendant to accompany them or have made him believe he was under arrest. There was no physical restraint and no show of weapons or force. Defendant was transported to the station in an unmarked car absent the cagelike partition between the front and back seats. At the station, defendant was read his *Miranda* rights, but because he appeared slower than normal and indicated to the officers that he was a special education

student, one of the officers paraphrased the rights to make certain defendant understood them and also had defendant read the rights form aloud. When defendant got to the waiver of rights, the officer advised defendant in plain language what the waiver meant. Defendant waived his rights and the officers subsequently questioned him regarding the offenses involved. Defendant claimed innocence, giving the officers an exculpatory story.

Before defendant consented to having his photograph taken, an officer explained to defendant that the photo was to be used in a photo lineup and that defendant did not have to submit to having his photograph taken. The officer also told defendant that the photograph was going to be shown to the victim of the offenses that the officers were investigating. These statements by the officer were more than is required to obtain a legally valid consent. *Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041.

Regarding the physical lineup, defendant was informed twice, once on the evening before the lineup and again on the morning of the lineup, that he could have an attorney present. Both defendant and his mother indicated that they did not desire the presence of an attorney. *United States v. Wade* (1967), 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926, and its progeny did not require more. Additionally, the officer conducting the lineup made certain defendant knew what a lineup was and how it was conducted. The testimony of the officer who organized the lineup indicated that all the individuals used in the lineup were Negroes, all were dressed in jail coveralls, all were young looking, all were of similar medium build, all were clean shaven, and three were within an inch of defendant's height while two were somewhat taller. Although defendant stood in the middle of the lineup, he chose that particular position. All members of the lineup were asked to speak three statements. However, the evidence indicated that these statements were unnecessary, as the victim, in pointing out defendant as her attacker, related to the officer conducting the lineup, "I could have told you the minute he walked in that room. I am so sure, you won't believe it."

A defendant's mental capacity must be taken into consideration in determining whether his actions were voluntary. (*People v. Turner* (1973), 56 Ill. 2d 201, 206, 306 N.E.2d 27.) Nevertheless, although the mental capacity of a defendant to understand what is told or read to him is an important factor, subnormal intelligence alone does not necessarily render a defendant incapable of understanding or waiving his constitutional rights. (*People v. Devine* (1981), 98 Ill. App. 3d 914, 922, 424 N.E.2d 823, *cert. denied* (1982), 458 U.S. 1109, 73 L. Ed. 2d

1371, 102 S. Ct. 3490.) In this court, defendant has substantially relied on the direct testimony of Dr. Rosenwald to argue that defendant lacked the intellectual ability to understand or intelligently waive his rights. However, this argument ignores the fact that on cross-examination Rosenwald also stated that defendant could possibly understand and knowingly waive his rights if such rights were explained to him in a simplified manner. That the rights were explained in this manner was apparent from the testimony of the various police officers and investigators who read defendant his rights at different times during their investigation. Their testimony revealed that the officers read the rights to defendant, asking him if he understood each; that they requested defendant to read them back to the officers; that when defendant had difficulty pronouncing some of the words, the officers helped him and then asked him if he knew what the words meant, explaining them in simple terms if he did not; and that the officers also paraphrased the rights and the waiver to make certain defendant understood them. At all stages of the investigation, the police took into consideration defendant's apparent slowness.

At a hearing on a motion to suppress, it is the trial court's function to weigh the credibility of the witnesses and to resolve any conflicts in their testimony, and the court's findings will not be disturbed unless they are against the manifest weight of evidence. (*People v. Wilson* (1984), 124 Ill. App. 3d 831, 840, 464 N.E.2d 1158.) Here, the question presented by defendant is not whether defendant was advised of his *Miranda* rights (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1620), but whether he knowingly waived these rights. Having observed the witnesses, their demeanor while testifying, and their candor and sincerity, the trial judge was in a far better situation than this reviewing court to weigh the evidence regarding defendant's ability to understand and waive his rights. That the trial judge placed more emphasis on the testimony of the various officers involved than on the prior testimony of Dr. Rosenwald was within his province. Because the officers' testimony demonstrated that defendant had knowingly waived his rights, we believe that the court's denial of defendant's suppression motions was not contrary to the manifest weight of the evidence.

■ Defendant's final contention is that the trial court erred in not striking the entire testimony of the State's expert serologist, Dr. Tahir, when it was revealed on cross-examination that Tahir's report, submitted to defendant pursuant to discovery, did not include one of the tests run on the blood samples taken from defendant's bloodstained shirt. Defendant maintains that this incomplete discovery dis-

closure deprived him of his opportunity to cross-examine and of his right to a fair trial. We do not agree.

First of all, at the time of the detection of the alleged discovery violation, the court granted a recess and gave Tahir's notes, regarding the Gm 10 test that was performed but not reported, to defense counsel so he could phone his expert in California to discuss the notes. Second, the State offered to keep Tahir for the rest of the week (three days), although he was scheduled to leave town the next morning, or even to keep Tahir for the following week, if necessary, to provide defense counsel adequate time to prepare for cross-examination on the Gm 10 test results. Yet, defense counsel refused the offer, insisted that Tahir's entire testimony be stricken or cut off, and declined to ask any further questions. Third, despite defense counsel's contentions to the contrary that the failure of Tahir to include the Gm 10 test results in his report deprived defendant of an opportunity to conduct a meaningful cross-examination of the test, the record reveals that defense counsel was not unfamiliar with this particular test and its significance. The record shows that a few days prior to trial defense counsel tendered to the State an authoritative article dealing with Gm testing on blood samples in which it was stated that the presence of other Gm factors in samples could be confirmed by testing for Gm 5 or Gm 10. Thus, defense counsel was aware of the significance of the Gm 10 test. As a result, we find defendant's contention that his counsel could not have possible conducted an adequate cross-examination of the State's expert, even if permitted a few days to prepare as the State offered, to be unworthy of belief.

Moreover, at the time the defense counsel claimed he was "caught off guard" by his discovery on cross-examination that Tahir had not included in his report the results of the Gm 10 test run on defendant's blood-stained shirt, counsel could have sought a continuance. Yet, defendant did not seek this recourse, did not accept Tahir's offer to explain his test results to defense counsel's expert, and did not accept the State's offer to keep Tahir in town and available for as long as it would take defense counsel to adequately prepare for his cross-examination of the Gm 10 test results. Instead, defense counsel insisted that Tahir's entire testimony be stricken. The court refused, and this refusal to exclude this evidence was not, in our opinion, in error. Excluding evidence not disclosed pursuant to discovery should be resorted to only when a recess or continuance would be ineffective (*People v. Nelson* (1980), 92 Ill. App. 3d 35, 45, 415 N.E.2d 688, *cert. denied* (1981), 454 U.S. 900, 70 L. Ed. 2d 217, 102 S. Ct. 404), and, failure to seek a continuance waives a claim of error based upon sur-

prise. *People v. Visgar* (1983), 120 Ill. App. 3d 584, 589, 457 N.E.2d 1343.

■ However, even if we were to conclude that the trial court's failure to strike Tahir's testimony due to the alleged discovery violation was error, we are convinced it did not constitute reversible error, requiring us to reverse defendant's conviction. A reviewing court will not reverse a judgment merely because error has been committed unless it is evident that real justice has been denied or that the finding of guilty may have resulted from such error. (*People v. Brown* (1982), 104 Ill. App. 3d 1110, 1121, 433 N.E.2d 1081.) Such was not the case here. The record shows that Tahir's testimony was nonessential to the jury's finding of defendant's guilt. The clear, convincing, and uncontradicted testimony of the victim alone established that defendant was her attacker. The evidence showed that the victim spent approximately 15 minutes with defendant, much of that time face to face with him. She testified that she concentrated on his face throughout most of the attack because she knew she was going to contact the police afterwards. Additionally, she related that her selection of defendant in the photo lineup and in the physical lineup was based strictly on his facial features and that the moment he appeared in the physical lineup she knew defendant was her attacker. Clearly, the victim's testimony was sufficient to cause the jury to find defendant guilty and, thus, we believe it was unlikely that the jury's finding resulted from Tahir's testimony regarding tests run on the blood-stained shirt. Therefore, in our opinion the trial court's refusal to strike Tahir's entire testimony did not constitute reversible error.

For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

REINHARD and STROUSE, JJ., concur.