THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CURTIS HALL, Defendant-Appellant.

First District (3rd Division)   No. 1—86—1637

Opinion filed July 12, 1989.

Michael J. Pelletier and Thomas Long, both of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Marie Quinlivan Czech, and Inez Toledo-Bargioni, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE FREEMAN delivered the opinion of the court:

Defendant, Curtis Hall, was indicted for aggravated criminal sexual assault, criminal sexual assault, aggravated kidnapping, kidnapping and unlawful restraint. After a jury trial in the circuit court of Cook County, defendant was convicted of aggravated criminal sexual assault, criminal sexual assault and kidnapping. Defendant was sentenced to 60 years' imprisonment.

Prior to trial, the trial court conducted a fitness hearing. Dr. Albert Stipes, the State's psychiatrist, testified that defendant would be fit to stand trial if he received anti-psychotic medication. He also stated that, without the medication, defendant could regress to his previous state, although not immediately but over several weeks. The trial court found defendant fit to stand trial after the parties stipulated that Dr. Gilbert Bogan, the defense psychiatrist, agreed that defendant would be fit with medication.

At trial, complainant testified that she was walking south on La-

fayette Street on her way home from stores at 87th and the Dan Ryan expressway at approximately 1:30 p.m. on August 22, 1984. As she approached a viaduct, a man came up to her from behind, put his hand over her mouth and told her to keep walking. When complainant said, "[N]o," the assailant threatened to kill her if she resisted. He then twisted complainant's arm behind her back and forced her up to the railroad tracks. At this time, the attacker placed an object which felt like a gun against complainant's back. However, complainant never saw a gun.

Once they reached the railroad tracks, complainant was able to see her assailant. At this time, a train came along and the assailant put his arm around complainant's neck and forced her to kiss him. The assailant forced complainant to walk along the tracks for approximately 45 minutes. Thereafter, the assailant forced complainant down a little hill onto a grassy area and told her to disrobe. When complainant refused, the assailant put his hand up to her face and forced her to do so. The assailant then forced complainant to have sexual intercourse with him. During the act, complainant was face to face with her assailant. Afterwards, the attacker told complainant that she looked like his wife, who had taken his children away from him, and that she was going to get what his wife deserved. The attacker also told complainant that the strange phone calls she had been receiving were from him. Over the next two to three hours, the attacker forced complainant to have sexual intercourse five more times.

When the assailant lay down a short distance from complainant after the last act of intercourse, she hit him with a stick, picked up her clothes and ran. The assailant chased complainant but she was able to elude him. Complainant eventually flagged down a Chicago police car. Complainant and the police then attempted to locate the scene of the assault. Thereafter, the police took complainant home and then to the hospital. Complainant identified defendant as her attacker in a police lineup on September 17, 1984.

The State also introduced evidence of an earlier attack upon two young women allegedly committed by defendant in the vicinity of the attack upon complainant.

Alicia Allison testified that she and a friend, Karen Thomas, were walking west on 87th Street to a gas station after alighting from the CTA's Dan Ryan line on the afternoon of August 19, 1984. As they approached a railroad viaduct, a man came up from behind them and placed a gun between their heads. The attacker grabbed Thomas by the neck, put the gun to her head and told the women to climb up to the railroad tracks. Once they reached the top of the embankment,

the assailant forced the women to walk along the tracks. The assailant forced first one women and then the other to crawl along the tracks as he held the second by the neck. After about 90 minutes, Allison attempted to run away. However, the assailant put the gun up to Thomas' face and threatened to shoot her if Allison did not return. Allison then returned and the assailant hit her across the face with the gun.

The assailant then forced Allison to crawl along the tracks for 35 minutes. Thereafter, he forced the women into a prairie area away from the tracks. As their attacker began touching the women's breasts and loosening their belts, Allison hit him in the face with a tree branch and the women ran off in different directions. During the time the women had been with their assailant, he had talked about his mother, his wife and "her kids." After she ran away, Allison came upon a group of people in the street, one of whom called the police. Allison gave the police a description of the attacker. Allision identified defendant as her attacker in the September 17, 1984, lineup.

After the jury returned its verdict, defense counsel requested a fitness examination of defendant. The trial court, finding no *bona fide* doubt of defendant's fitness, denied defense counsel's request. Subsequently, the trial court denied defense counsel's renewed motion for a fitness examination prior to defendant's sentencing after finding no *bona fide* doubt of his fitness.

OPINION

Defendant first contends the State denied him a fair trial by introducing evidence of the Allison-Thomas attack. He asserts that the Allison-Thomas attack was insufficiently similar to the attack upon complainant to indicate that both offenses were committed by defendant, *i.e.*, to prove *modus operandi*.

■ Other crimes evidence, although generally inadmissible, is admissible for certain purposes. One of those purposes is to prove *modus operandi* or "method of working." (*People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 486, 485 N.E.2d 1292.) The term refers to a pattern of criminal behavior so distinct that separate offenses are recognized as the work of the same person. Between the offense offered to prove *modus operandi* and the offense charged there must be a clear connection which creates a logical inference that, if defendant committed the former offense, he also committed the latter offense. This inference arises when both crimes share peculiar and distinctive features not shared by most offenses of the same type and which, therefore, earmark the offenses as one person's handiwork. However, it is

unnecessary that the offenses be identical. *Kimbrough*, 138 Ill. App. 3d at 486-87.

■ Applying the foregoing principles here, we believe that the Allison-Thomas attack and the offense charged were sufficiently similar to allow use of the former to prove defendant's commission of the latter.

The most distinctive feature which both offenses shared and which is not shared by most rape assaults is that the assailant in each attack marched his victims along railroad tracks for a considerable length of time in broad daylight after having accosted them. Given the great number of railroad viaducts and embankments in Chicago, we cannot say that we would necessarily find separate attacks upon women so similar as to have one author if the assailant in each merely accosted his victim or victims near a viaduct, forced them up a railroad embankment and, once there, sexually assaulted them or attempted to do so. However, where the assailant in each attack takes the added step and substantial risk of discovery of marching his victims a considerable distance from the site of their first contact in broad daylight, we find that fact alone sufficient to earmark the attacks as the handiwork of the same individual.

That fact, however, was not the only distinctive feature common to both offenses and not necessarily common to other offenses of the same type. Additionally, complainant and Allison testified that their assailant talked about his wife and his children, in the charged incident, or his wife's children, in the Allison-Thomas attack.

Defendant takes issue with the facts relied upon by the trial court in admitting the Allison-Thomas attack into evidence. In addition to the fact that each attack occurred near a railroad viaduct, those facts included the spatial and temporal proximity of the attacks and the fact that the victims were choked and threatened with death. Contrary to defendant's assertion, such facts are often taken into consideration in determining whether other crimes evidence is admissible to show *modus operandi*.

■ In *People v. Cook* (1977), 53 Ill. App. 3d 997, 369 N.E.2d 246, the court held that there were insufficient similarities between offenses to show *modus operandi* where, *inter alia*, one rape victim was threatened with death while a second was not. In *People v. Theriault* (1976), 42 Ill. App. 3d 876, 356 N.E.2d 999, and *People v. Emmett* (1975), 34 Ill. App. 3d 167, 340 N.E.2d 235, the courts considered the fact, *inter alia*, that rapes occurred within five blocks of one another in determining that they revealed a *modus operandi* and a common scheme or design, respectively. In *People v. Pavic* (1982), 104

Ill. App. 3d 436, 432 N.E.2d 1074, *overruled on other grounds in People v. Pettit* (1984), 101 Ill. 2d 309, 461 N.E.2d 991, the court considered the fact, *inter alia*, that the assailant in each of three attacks choked his victims until their resistance was overcome to find sufficient similarities between them to show a *modus operandi*. Finally, although individual similarities may be common to rapes in general, the *modus operandi* exception is applicable where offenses share features which are distinctive in combination. (See *Pavic*, 104 Ill. App. 3d at 443.) We believe that to be the case here.

Defendant also asserts that the differences between the offenses far outweighed their similarities. Specifically, defendant notes the difference in the number of victims. He also notes that the assailant in the offense charged told complainant that he was the person making the strange calls to her house and made inexplicable references to former Chicago mayor Jane Byrne.

These differences do not outweigh the similarities between the offenses. In *People v. Carter* (1985), 132 Ill. App. 3d 523, 477 N.E.2d 1307, evidence of the rape of one victim in an elevator was held admissible to prove the defendant's *modus operandi* in committing, at one time, the rape of a second victim and the robbery of the second and a third victim. That is, evidence of the former offense was admissible to prove the latter offenses notwithstanding that the number of victims differed in each attack. Lastly, the importance of the fact that the assailant in each attack may not have said exactly the same things to his victims is greatly diminished by the fact that he did mention his wife and his or her children in both attacks.

Defendant lastly asserts that the differences in complainant's and Allison's physical descriptions of their assailants, immediately after their attacks and at trial, also made Allison's testimony incompetent to prove *modus operandi*.

Both complainant and Allison identified defendant as their assailant in a lineup one month after they were attacked and at trial. The fact that the women's physical description of their assailant immediately after the attacks and at trial differed from one another's and from defendant's actual appearance do not compel the conclusion that their in-person identifications of defendant were mistaken. In this regard, we believe that a trier of fact may properly place greater weight upon evidence of identification after perceiving a defendant than on oral testimony of physical description. Lastly, the fact that complainant failed to mention that her assailant wore "bathtub chains," which defendant cites as the most important aspect of Allison's description of defendant, does not give us pause. "Bathtub

chains," like any physical accoutrement or piece of jewelry, may be easily removed from one day to the next.

In sum, the Allison-Thomas attack was sufficiently similar to the attack upon complainant as to have been properly admitted to show *modus operandi* and, thereby, that defendant committed the offense charged.

Defendant next contends that the testimony of Calumet Park police officer James Emmett that he observed defendant standing near a railroad station on September 1, 1984, and that he photographed him on that day, denied him a fair trial. Defendant repeatedly asserts that Emmett's testimony was improper because it created an inference that he had been involved in "prior" criminality or had "prior" contact with the police.

Preliminarily, we must note that, in view of the State's argument that Emmett's testimony, and by implication, the photograph he took of defendant, were relevant to the issue of identification, defendant's failure to include the photograph in the record on appeal makes determination of this issue needlessly difficult. That difficulty notwithstanding, we disagree with defendant.

■■ ■ For purposes of determining whether evidence indicating criminal activity or acquaintance with the police is improper, whether it indicates such prior to, or at the time of, the offense charged, not after, is controlling. (See, *e.g.*, *People v. Bryant* (1986), 113 Ill. 2d 497, 499 N.E.2d 413; *People v. Stover* (1982), 89 Ill. 2d 189, 432 N.E.2d 262; *People v. Spiezio* (1982), 105 Ill. App. 3d 769, 434 N.E.2d 837.) The fact that Emmett photographed defendant *after* both the Allison-Thomas attack and the offense charged shows that the photographs could not implicate him in criminal conduct prior to, or at the time of, the attacks. As such, Emmett's testimony did not deny defendant a fair trial. Rather, we believe that testimony was properly admissible to provide the foundation for introduction of the photograph he took. Moreover, we find that the State introduced the photograph for the proper purpose of corroborating complainant's and Allison's testimony as to defendant's appearance on the dates of his alleged attacks upon them.

Defendant asserts that his appearance on September 1 was irrelevant to the issue of identification because neither the offense charged nor the Allison-Thomas attack occurred on that date. In so arguing, defendant ignores Emmett's testimony at the hearing on defendant's motion to suppress the evidence of his identifications.

Emmett testified that, on September 1, defendant was wearing a waist-length or three–quarter-length leather jacket and a stocking cap

and that this struck him as unusual because it was a very hot day, *i.e.*, "in the 80's." While Emmett did not testify at trial as to how defendant was dressed in the photograph, we will assume that he was dressed as Emmett described him at the suppression hearing. When the record is incomplete, a reviewing court will indulge every presumption in favor of the judgment. (*People v. Worsham* (1979), 79 Ill. App. 3d 1061, 398 N.E.2d 1068.) Moreover, Emmett did testify at trial that September 1 was hot and humid. Thus, defendant is incorrect when he argues that Emmett's testimony and, necessarily, the photograph were irrelevant to any issue in the case.

Emmett's testimony and the September 1 photograph were corroborative of complainant's and Allison's testimony, not of defendant's physical appearance, upon which defendant focuses, but of how defendant was dressed on the dates of his attacks against them. Complainant testified that it was very hot and 95 degrees on the day she was attacked. She further testified that her assailant wore a jacket and cap. Similarly, Allison testified that the weather on the day she and Thomas were attacked was "real nice" and that her assailant wore a hat and a hooded jacket, the zipper of which was fastened. To the extent that Emmett's testimony and the photograph of defendant tended to corroborate complainant's and Allison's descriptions and, thus, their identifications of defendant, they were properly admitted.

Nor do we find that Emmett's testimony that he observed defendant near a railroad station deprived defendant of a fair trial. A trial free of this testimony would not have resulted in a different verdict.

Defendant next contends that there was a *bona fide* doubt of his fitness to stand trial and to be sentenced and that the trial court thus denied him due process by denying his requests for a fitness examination and hearing before sentencing him. In view of the pretrial stipulation that he was fit to stand trial with medication, defendant asserts that defense counsel's post-trial statements to the trial court raised a *bona fide* doubt of fitness. Defendant cites *People v. Jackson* (1978), 57 Ill. App. 3d 809, 373 N.E.2d 583, in support.

A defendant is unfit to stand trial or be sentenced if he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense. (Ill. Rev. Stat. 1985, ch. 38, par. 104—10.) If a *bona fide* doubt of fitness is raised, a trial court shall determine the issue before proceeding further. (Ill. Rev. Stat. 1985, ch. 38, par. 104—11(a).) The decision to grant a fitness examination or, thereafter, a fitness hearing, is addressed to the sound discretion of the trial court (see *People v. Jenkins* (1978), 67 Ill. App. 3d 565, 568, 384 N.E.2d 1348) since it is in a superior position to observe and evaluate

the defendant's conduct (*People v. Murphy* (1978), 72 Ill. 2d 421, 431, 381 N.E.2d 677). Therefore, those determinations will not be disturbed absent an abuse of that discretion.

Immediately after the jury rendered its verdicts on April 7, 1986, defense counsel requested a presentencing fitness examination. When asked the basis of the request, defense counsel stated that defendant had not received his medication that day and felt no need to take it. Defense counsel immediately then stated that he nevertheless believed that defendant "could be fit for today's proceedings as well as prior proceedings" but that he would like some assurances that defendant would take his medication up to the time of sentencing.

Prior to defendant's sentencing on May 21, 1986, defense counsel informed the court that defendant had not received his medication since his transfer to Division VI of the Cook County jail, about one month before the trial began on April 4. Defense counsel also informed the court that it had been found in the past that defendant required medication to be fit for legal purposes. Finally, defense counsel noted the observation of the probation officer who conducted the presentence investigation that, when he interviewed defendant, he "was somewhat distant to reality." On the basis of the foregoing, defense counsel requested a fitness examination, which the trial court denied.

The record reveals that defense counsel's request for a fitness examination on April 7 was based solely on his concern that defendant continue to take his medication up to the time of his sentencing. The record also reveals that his concern was predicated solely on the fact that defendant was housed in Division VI, where, defense counsel felt, the assurances that he would take his medication were not as good as in the hospital unit.

■ Thus, defense counsel's request for a fitness examination was not based on any knowledge that defendant had not been taking his medication prior to that day or would not take it thereafter. Moreover, although defense counsel did inform the court that defendant had not taken his medication that day, he also stated his belief that defendant "could be fit" for that day's and all prior proceedings. Defense counsel's first post-trial statements to the court regarding defendant's fitness provided little support, if any, for a finding of a *bona fide* doubt of fitness, either to stand trial or to be sentenced. The trial court did not abuse its discretion when it denied defense counsel's request for a fitness examination on the ground that his concern was speculative and did not rise to a *bona fide* doubt of fitness.

In contrast to his prior post-trial statements to the court, defense

counsel did state on May 21 that "it was [his] knowledge" that defendant had not received any medication in Division VI. However, defense counsel did not state the facts which formed the basis of that knowledge. While defense counsel, as an officer of the court, must be presumed to have spoken truthfully regarding his "knowledge" (see *People v. Mack* (1989), 128 Ill. 2d 231, 252), his failure to state any underlying facts prevented the trial court from *independently* evaluating the reliability of that knowledge. Moreover, defense counsel merely repeated his belief that the assurances that defendant was receiving his medication in Division VI were not very good. Defense counsel's statements to the trial court, prior to defendant's sentencing, thus failed to raise a *bona fide* doubt of fitness.

Moreover, neither defendant's prior psychiatric history nor the probation officer's observation required the trial court to grant a fitness examination or hearing. In this regard, we do not believe the court abused its discretion in relying, instead, upon its own observations of defendant throughout the trial (see, *e.g., People v. Bailey* (1986), 141 Ill. App. 3d 1090, 1098, 490 N.E.2d 1334) and its observation and questioning of him prior to sentencing (see, *e.g., People v. Freeman* (1987), 162 Ill. App. 3d 1080, 1101-02, 516 N.E.2d 440) to deny the request for a fitness examination.

Defendant also asserts that the confusion he exhibited prior to being sentenced with regard to when he was transferred to Division VI revealed cognitive difficulties which also raised a *bona fide* doubt of fitness.

Prior to sentencing defendant on May 21, the trial court questioned him regarding whether he had been receiving his medication in Division VI. When asked when he was transferred there, defendant said "June or May." According to defense counsel, defendant had been transferred to Division VI about one month before the start of trial in April. Therefore, he could not have been transferred in May. And he most certainly could not have been transferred in June. However, any cognitive difficulties revealed by defendant's apparent confusion as to when he was transferred to Division VI did not necessarily reveal a *bona fide* doubt of fitness. Although a defendant's mind may be otherwise unsound, he may nonetheless be fit to stand trial and be sentenced. (See *People v. Murphy* (1978), 72 Ill. 2d 421, 433, 381 N.E.2d 677.) Moreover, the trial court was in a superior position to gauge defendant's cognitive abilities and we decline to substitute our judgment for that of the trial court solely on the cold record before us.

In sum, we do not believe the denial of defense counsel's requests

for a fitness examination and hearing prior to sentencing was an abuse of discretion.

*People v. Jackson* (1978), 57 Ill. App. 3d 809, 373 N.E.2d 583, does not compel a contrary conclusion. In *Jackson*, the trial court ordered that the defendant undergo a fitness examination prior to being sentenced. On the day of the sentencing hearing the court was informed that the defendant had not been examined as ordered and that he had not received, that day, the medication which had been found necessary to maintain his fitness to stand trial. The court nevertheless proceeded to sentence the defendant. The appellate court remanded the case for resentencing based on its conclusion that the defendant's failure to receive the medication necessary to render him fit raised a *bona fide* doubt of his fitness. The fact that the trial court indicated its concern with the defendant's fitness when it ordered the fitness examination buttressed the appellate court's conclusion. *Jackson*, 57 Ill. App. 3d at 814.

The psychiatric testimony at the defendant's pretrial fitness hearing in *Jackson* was apparently limited to the fact that he would be fit with medication. That is, there was apparently no testimony regarding the effect upon the defendant of a failure to take or receive the medication. The apparently unqualified psychiatric testimony in *Jackson* thus allowed the appellate court to conclude, from the record before it, that there was a *bona fide* doubt of the defendant's fitness where he had not received, on one day, the medication necessary to maintain his fitness. In contrast to *Jackson*, the psychiatric testimony in this case was not unqualified. Dr. Stipes also testified that, if defendant did not receive the medication necessary to render him fit, he would "eventually" regress to his unfit state but it might take "several weeks" for that to occur. Thus, unlike the situation in *Jackson*, the psychiatric testimony in this case does not allow us, as a court of review, to determine, solely from the record and without benefit of observing defendant, that there was a *bona fide* doubt of his fitness at the time he was sentenced.

For all of the foregoing reasons, defendant's convictions and sentence are affirmed in their entirety.

Affirmed.

WHITE and CERDA, JJ., concur.