THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
TERRY BERRY, Defendant-Appellant.

First District (1st Division)   No. 1—89—0384

Opinion filed November 4, 1991.

Michael J. Pelletier and Anna Ahronheim, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Janet C. Mahoney, Special Assistant State's Attorney, and Renee Goldfarb and Carol L. Gaines, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

After a jury trial, defendant Terry Berry was convicted of two counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a)(2)) and one count of robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—1(a)). The circuit court sentenced defendant to concurrent 60-year terms on the aggravated criminal sexual assault counts and a seven-year concurrent term on the robbery count.

Defendant contends on appeal that he is entitled to a new trial because: (1) the court erred in admitting "other crimes" evidence under the *modus operandi* exception where the other crime and the charged offense were not so similar as to earmark both as the "handiwork" of the same individual; (2) the court improperly told the jury during *voir dire* it would have no trouble concluding that the State had proven beyond a reasonable doubt that a crime had occurred as charged in the indictment; (3) the court, during *voir dire* and in instructing the jury, improperly referred to the complainant as a "victim" without simultaneously providing a neutral definition; (4) the robbery instruction misstated the State's burden of proof; (5) the prosecutor argued facts during closing argument which were not in evidence; and (6) the cumulative effect of all errors operated to deny him a fair trial. We affirm.

The complainant, A.M., testified that, on the evening of July 24, 1986, she was working as a waitress at the "Mellow Yellow" restaurant in the Hyde Park neighborhood of Chicago. While walking home on the 5400 block of Blackstone Street in Hyde Park, complainant saw a man walking quickly towards her. The man, later identified in court as defendant, was well dressed, muscular and looked like someone who lived in Hyde Park and who it "would be safe to cross paths with." As they passed, defendant held his head high and "murmured" something to A.M. Suddenly, defendant forcefully grabbed A.M. from behind. He pulled her head toward her right shoulder, covered her mouth with his hand and used his other hand to hold down her left arm. Defendant said "this is a stick-up," and told her that if she screamed he would kill her.

Defendant pulled A.M. into a 10-foot-wide gangway between two houses. Defendant told A.M. to give him all her money and he would not hurt her. A.M. gave defendant $40, but defendant told her it was not enough and pushed her to the other side of the gangway. A.M. told defendant she had some change and handed defendant her apron, which contained the change. Defendant collected the change and, re-

peating he needed more money, pulled open A.M.'s shirt and looked in her bra for more money.

Defendant's voice became more insistent. He told A.M. that if she would perform oral sex on him he would let her go. A.M. tried to run, but defendant grabbed her and threw her to the ground. Defendant got very angry, grabbed her around the neck and told her that she was a "stupid bitch" because he could break her neck. While choking her, he repeatedly asked if she understood. A.M. told defendant she did, and he stopped.

Defendant lifted A.M. to a sitting position and got up on his knees. Defendant unzipped his pants and put his penis in her mouth. A.M. testified that defendant began to "talk sexy," saying things like, "I know you can make this feel really good." When the situation did not progress, defendant told A.M. that she was going to give him "some sex." Defendant momentarily released A.M., and she tried to run and yell for help. Defendant angrily responded by hitting A.M. in the head, causing her left temple to immediately swell. Defendant sat on A.M.'s hips and thighs and ripped her shirt apart. He then grabbed her pants and underwear and pulled them down and proceeded to force his penis into her vagina.

Defendant moved off complainant, and she sprang to her feet. While facing him from a three-foot distance, A.M. asked defendant how long he wanted her to wait while he got away. Defendant said nothing but wiped himself off with her apron. He looked around and walked to the opening of the gangway. He looked both ways, then walked quickly heading north.

After a few minutes, A.M. put on her pants and ran to a house where she banged on the door. Roxanne Friedman, who lived next door, came to A.M.'s assistance. A.M. told Friedman that she had been raped and asked her to call the police. Friedman took A.M. to her house and called the police.

Friedman later testified and corroborated A.M.'s testimony. Friedman added that A.M. appeared disheveled: her shirt was in shreds and covered with dirt; she had an egg-like bump on the left side of her head; and her right eye was beginning to blacken. Chicago police officer Lundin, who responded to Friedman's call, testified to similar injuries, but also noticed bruises on A.M.'s arms. Lundin later took A.M. to the hospital where he turned her over to hospital personnel.

Following the incident, A.M. described her assailant as a muscular, black male having medium length, curly black hair. He used a hair preparation but not a lot of it. On July 25, 1986, A.M. viewed mug shots but could not identify anyone. A.M. also viewed a composite

drawing. She told an officer that the sketch could possibly be of her assailant.

On December 18, 1986, A.M. viewed a lineup and started to shake when she observed defendant. A.M. identified defendant as her assailant. Detective Markham later testified and corroborated A.M.'s identification as well as adding the circumstances surrounding the lineup. In May 1987, A.M. was taken to the hospital where she gave blood and saliva samples.

Annette Kinsella testified that she was a nurse in the University of Chicago emergency room. Kinsella treated A.M. and was informed that A.M. had been vaginally and orally raped. Kinsella described A.M. as disheveled. Her blouse was torn and covered with dirt. A.M.'s injuries included an egg-like bump on the left side of her forehead, abrasions to her upper arm and swollen labia. An oral and vaginal swab and smear were taken. A.M.'s head and pubic regions were also combed for hairs.

Forensic serologist Christine Anderson testified that she analyzed evidence collected in connection with A.M.'s case. Anderson found the presence of spermatozoa on the vaginal slide but none on the oral swab or slide. Anderson also tested the vaginal swab to ascertain the blood and secretion type of both A.M. and defendant. Anderson found that defendant had type A blood and was a secretor and that A.M. had type O and was also a secretor. The swab demonstrated type A and H activity. Anderson stated that only 30% of the population had type A blood and was a secretor.

Forensic criminalist Maria Pulling testified regarding trace evidence. On September 10 and 11, 1987, she examined hair samples of A.M. and defendant. After explaining the procedure for identifying distinguishing characteristics of hair, Pulling testified that A.M.'s and defendant's hair were not consistent with each other. Pulling further stated that she scraped A.M.'s blouse to collect all trace materials. She examined the trace materials under a stereomicroscope and observed several shafts and fragments of human hair. After comparing these shafts with her known samples from A.M. and defendant, Pulling found that several of the shafts were consistent with hairs from the complainant. Pulling also found one shaft which was consistent point for point with defendant's pubic hair. She identified 29 characteristics of that hair which were consistent with defendant's pubic hair, including one very rare characteristic. On cross-examination, Pulling admitted that the hairs found on the blouse could belong to someone else living in the Chicago area.

L.D. testified over defense objection about another sexual assault involving defendant. On August 11, 1986, she was living in Hyde Park and was 18 years old. Shortly after midnight, she was walking west down 55th Street to a friend's house. On her way, she cut behind a bank's parking lot located about two blocks from 5400 South Blackstone.

While behind the bank, L.D. was approached by a man whom she later identified as defendant. She did not suspect any danger. Defendant asked for directions to 55th and State Streets. She backed up because she thought a person living in Hyde Park should know how to get to that intersection. Defendant then grabbed her, putting one hand over her mouth and the other around her torso. She turned around, and while facing him, attempted to scratch his eyes. She testified that her fingers reached his face, but she was not sure whether she scratched him. L.D. also tried but failed to kick him. At some point, she felt that he was wearing a "pinky" ring and later told the police that he wore such a ring. Defendant pushed L.D. to the ground and said, "bitch, if you scream I'll hurt you." He said he did not want to hurt her and asked if she understood. He told her he had a gun, but she did not see one. He said, "bitch, I want your money," and she told him she had none. She threw her purse away from him, and he grabbed it and told her to empty it. She did so, and he saw that she had no money.

Defendant then said to L.D., "bitch, I want some pussy." She suggested they go to a nearby gangway because it was close to her friend's house and her friend might hear her. Defendant pulled her off the ground and, while covering her mouth with his hand, forced her down the street in the direction of the gangway she had suggested. He stopped in a closer gangway around 54th Street.

In the gangway, he told her to take off her shirt. She told him that was not what he wanted, so he said, "bitch, take your pants off." L.D. took off all her clothes from the waist down. Then he told her to sit on the ground and masturbate. She did as he ordered while he stood there staring.

Afterwards, he knelt on the ground and told her to come to him. He unzipped his pants and said, "bitch, suck my dick." While kneeling on the ground, she did as he ordered. Then he told her to lie on the ground and asked her if she was "clean." She said yes, and he asked her how old she was. She told him 18. Defendant then put his penis in L.D.'s vagina. When defendant was finished, L.D. dressed, and defendant told her to take off running. L.D. ran to her friend's house.

L.D. testified that on August 11, 1986, she had a conversation with two police officers. She told them about the pinky ring and described her attacker as a muscular black male, 6 feet tall, 175 pounds, and having a dark complexion. He wore a "gheri-curl" hair style reaching a little below his ears and a thick mustache. On December 18, 1986, L.D. identified defendant in a lineup.

After the State rested, defendant called Cloteil Jackson. She testified that she and defendant dated and lived together from June to November 1986. In August 1986, Jackson did not see defendant with scratches on his face or rings on his finger. During the entire time they lived together, defendant wore a gheri-curl hair style which reached down to his neck, just short of his shoulders. A gheri-curl is a greasy-curled look. During the summer of 1986, he wore his hair much neater than the way it appears in the photograph of the lineup. He did not resemble the person depicted in the composite drawing shown to the complainant.

In July 1986, Jackson worked for Kelly Temporary Services during her summer break from school. She worked an average of three to four days a week during both the morning and afternoon shifts. She probably worked July 24. During the summer of 1986, she probably worked out of Kelly's La Grange office. When she worked the day shift, she would return home at about 5 or 5:30 p.m. Defendant would return from work shortly after that time. If it was a week night, which July 24 was, Jackson and defendant would generally stay home.

Helen Berry testified that she was defendant's sister. In May 1986, defendant had long, course, natural hair. Defendant changed his hair in May into a gheri-curl style. She explained that the gheri-curl processing is a permanent cold-wave chemical solution used to straighten hair. After it is straightened, tiny rods are put in the hair to give it tight curls. In August 1986, defendant had no scratches on his face and wore no pinky rings. He looked nothing like the composite drawing.

In rebuttal, Margo Wilke testified that she was the manager of the Palos Heights Kelly office in 1986 and 1987 and that she knew Cloteil Jackson. She stated that Jackson first interviewed with Kelly in October 1986 and, therefore, could not have received an assignment in July 1986. Jackson worked only 51 hours for Kelly in 1986, and those occurred in October, November and December. The State rested.

Cloteil Jackson testified in surrebuttal that she completed the application at the Palos Heights office in October 1986. She completed a

different application to work at Kelly's other offices. She transferred to the Palos Heights office in October 1986. Defendant rested.

Defendant's first contention on appeal is that he was denied a fair trial by the improper admission of L.D.'s "other crimes" testimony. Generally, evidence of other crimes is inadmissible if relevant merely to establish a defendant's propensity to commit crime. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 182, 449 N.E.2d 821, 823, *cert. denied* (1983), 464 U.S. 844, 78 L. Ed. 2d 136, 104 S. Ct. 145.) Evidence of the commission of other crimes is admissible, however, when such evidence is relevant to prove any purpose other than propensity to commit crime, such as *modus operandi*, intent, motive, or absence of mistake. (*McKibbins*, 96 Ill. 2d at 182, 449 N.E.2d at 824; *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 484-85, 485 N.E.2d 1292, 1296.) It is within the sound discretion of the trial court to determine whether evidence of other crimes is relevant to a material issue and whether the probative value of such evidence outweighs its prejudicial impact; this determination will be overturned only if there exists a clear abuse of discretion. *People v. Fuller* (1983), 117 Ill. App. 3d 1026, 1036, 454 N.E.2d 334, 342-43.

The State proffered the other crimes evidence in this case pursuant to the *modus operandi* exception. The *modus operandi* or "method of working" exception refers to a pattern of criminal behavior so distinct that separate offenses are recognized as the work of the same person. (*People v. Hall* (1989), 186 Ill. App. 3d 123, 127, 541 N.E.2d 1369, 1371-72.) Between the offense offered to prove *modus operandi* and the offense charged, there must be a clear connection which creates a logical inference that, if defendant committed the former offense, he also committed the latter. (*Hall*, 186 Ill. App. 3d at 127, 541 N.E.2d at 1372.) This inference arises when both crimes share peculiar and distinctive features not shared by most offenses of the same type and which, therefore, earmark the offenses as one person's handiwork. (*Hall*, 186 Ill. App. 3d at 127, 541 N.E.2d at 1372.) The offenses need not be identical but must share features which, although common to similar crimes in general, are distinctive when considered together. *Hall*, 186 Ill. App. 3d at 129, 541 N.E.2d at 1372.

In this case, to support its argument that the other crimes evidence was proper, the State directs this court to the following similarities: (1) each victim was a young, white female; (2) the attacks took place one block away and less than three weeks apart in a residential area within Hyde Park around midnight; (3) each victim was initially communicated to and then restrained in a similar manner; (4) each victim was threatened physically, called a "bitch," asked if she under-

stood, robbed, and then orally and vaginally raped in a gangway; and (5) each victim gave a similar description of her assailant and later identified him at a lineup and in court.

Defendant responds that many of the similarities listed above are common to crimes of this type. For example, defendant cites to the testimony that Hyde Park is a dangerous neighborhood and that robbery/rapes usually occur late at night upon young women walking alone who are usually threatened with physical abuse or physically abused and then removed to an isolated location where the assault occurs. Moreover, defendant notes that in crimes of this type, an assailant usually calls the victim names and asks if she understands that she will not get hurt if she complies with his demands.

Aside from his commonality response, defendant further responds that neither crime shares a single distinctive or signature trait. Rather, defendant notes that each crime is different in the following significant respects: (1) A.M.'s assailant "murmured" something and grabbed A.M. from behind while L.D.'s assailant asked her for directions face to face and then grabbed her; (2) L.D.'s assailant repeated the word "bitch" five times and used it prior to various commands while A.M.'s assailant used it only once while choking A.M.; (3) A.M.'s clothes were ripped off while L.D. removed her own clothes; (4) A.M.'s assailant ran away while L.D.'s assailant allowed L.D. to run away; and (5) L.D.'s assailant told her to masturbate and asked if she was "clean." These dissimilarities, defendant asserts, preclude the two crimes from having the same author.

■■ Despite defendant's arguments, the circuit court did not clearly abuse its discretion in allowing L.D. to testify about her assault. Initially, we agree with defendant that the two assaults in this case do not share any one single feature which can be described as unique. (See *People v. Tipton* (1990), 207 Ill. App. 3d 688, 566 N.E.2d 352 (meat cleaver used in robbery); *Hall*, 186 Ill. App. 3d 123, 541 N.E.2d 1369 (victims marched along railroad tracks in broad daylight).) While the existence of such a feature makes for easier review, it is not a prerequisite to the application of the *modus operandi* exception. Compare *Tipton*, 207 Ill. App. 3d 688, 566 N.E.2d 352, and *Hall*, 186 Ill. App. 3d 123, 541 N.E.2d 1369, with *People v. Johnson* (1982), 107 Ill. App. 3d 156, 437 N.E.2d 436 (illustrating difficulty of determining whether crimes are sufficiently distinctive as to be like signature).

Here, both L.D. and A.M. identified defendant in court and during a pretrial lineup as their assailant. Their descriptions to the police after the incident, while different, nevertheless represent a reasonable

description of defendant. The record additionally shows that both attacks occurred one block away from each other and less than three weeks apart. Both victims were confronted initially in a relatively open area and then suddenly and physically restrained. Both victims were informed that they were being robbed and, apparently due to their failure to carry sufficient funds, sexually assaulted, first orally and then vaginally. While differences in the two crimes exist and both share features common to crimes of this type, the similarities the crimes share are sufficiently distinctive when considered together to yield the inference that the same person authored both crimes. We reiterate that this court operates as a reviewing court in this matter and cannot merely substitute its judgment for that of the trial court. We only hold that under the clear abuse of discretion standard, the other crimes evidence was properly admitted.

Defendant next contends that he was denied a fair trial when, during *voir dire*, the trial judge repeatedly made statements which "sent the unambiguous message that the State's only burden was to prove that Mr. Berry committed a crime." To support his contention, defendant directs this court to the following representative statements:

"THE COURT: I think everybody understands that if a crime has been committed, the State could very well prove that a crime has been committed beyond a reasonable doubt. The question would be whether or not this defendant committed that crime. And of course it serves no purpose to convict the wrong person. So what we're concerned about is that each of you will be fair and impartial in arriving at that decision and could do so.

\* \* \*

There is no question about that. Now the issue is could you put aside—we all know what everybody thinks is criminal. That's not the issue. The issue in this case is whether or not this defendant committed a crime as alleged by the State."

The State responds that defendant has waived this issue on appeal by failing to object to the comments and by not including the error in his post-trial motion. Alternatively, the State responds that the comments were proper and otherwise did not rise to the level of prejudicial error.

■ Initially, we agree that defendant has failed to preserve this issue for review. Defendant failed to object to the comments when made and failed to voice an objection when the court specifically asked counsel whether they had any objections to the *voir dire*.

Defendant also failed to raise this error in his post-trial motion. While defendant's nonaction regarding this issue would generally result in waiver (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1131-32, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274), we believe the plain error exception allows for review in this case.

Pursuant to this exception, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." (107 Ill. 2d R. 615(a).) Judicial interpretation of this exception provides that review is permitted of a claimed error where the evidence is closely balanced or the error is so fundamental and of such magnitude that the accused was denied a fair trial. (*People v. Herrett* (1990), 137 Ill. 2d 195, 209-10, 561 N.E.2d 1, 7-8.) In the former situation, a reviewing court addresses the merits of the claimed error to preclude the possibility that an innocent man was wrongly convicted as a result of even a minor error. (*People v. Carlson* (1980), 79 Ill. 2d 564, 576-77, 404 N.E.2d 233, 238.) Where the evidence is not closely balanced, there is no need to consider the error. (*Herrett*, 137 Ill. 2d at 209, 215-16, 561 N.E.2d at 8, 10-11.) In the latter situation, the rule is invoked where it is necessary to preserve the integrity of the judicial process and provide a fair trial. Where the error does not rise to the level of plain error, the claimed error is waived. *Herrett*, 137 Ill. 2d at 210, 215-16, 561 N.E.2d at 8, 10-11.

In this case, applying the first part of the plain error exception, we do not believe the evidence is closely balanced to permit us to reach the merits of the claimed error. A.M. identified defendant in a police lineup and again in court. Christine Anderson testified that defendant was of the same blood and secretion type as the perpetrator. Marie Pulling analyzed hair fragments and concluded that a hair found on complainant's blouse matched point for point with defendant's hair. Finally, L.D. identified defendant as the perpetrator of a similar rape committed upon her. As for defendant's evidence, we see defendant's "alibi" as not necessarily placing defendant at home on the night of A.M.'s attack. In summary, our review of the evidence leads us to conclude that it is not closely balanced.

Turning to the second part of the plain error test, we recognize that a less rigid application of the waiver rule must prevail where misconduct of the trial judge is concerned. (*People v. Sprinkle* (1963), 27 Ill. 2d 398, 399-401, 189 N.E.2d 295, 297; *People v. Kelley* (1983), 113 Ill. App. 3d 761, 766, 447 N.E.2d 973, 977.) Because of this relaxed standard, and because the judge's comments here deal with a

most serious subject matter—the State's burden of proof—we elect to resolve the plain error issue in defendant's favor and address the merits of the issue. See *People v. Mays* (1989), 188 Ill. App. 3d 974, 544 N.E.2d 1264 (plain error exception applied to correct judicial misconduct); *Kelley*, 113 Ill. App. 3d 761, 447 N.E.2d 973 (same).

In this case, we conclude that reversal is not required. First, the comments here clearly do not rise to the same level of prejudice as did the comments made in *Kelley*, a case upon which defendant heavily relies. There, the judge gave to the jury, prior to *voir dire*, his personal opinion that defendant committed the acts charged in the indictment. Clearly, such an egregious comment did not occur here.

Second, the court's remarks here are more innocuous than those made in *People v. Freeman* (1989), 182 Ill. App. 3d 731, 538 N.E.2d 681. In *Freeman*, the same trial judge involved in this case stated during *voir dire*: "We are not here to determine whether or not a crime has been committed, but whether or not the State can prove beyond a reasonable doubt that this defendant committed the crime." In finding the comments did not deny defendant a fair trial, the court was influenced by the trial judge's pre- and post-trial instructions that his comments were to be disregarded as well as by the overwhelming evidence of defendant's guilt. The court also noted that the jury was properly instructed on the elements of each offense and on its duty to find each element of each offense proven beyond a reasonable doubt.

In this case, the court did not *expressly* indicate to the jury, as it did in *Freeman*, that the State did not have to prove the commission of a crime. Thus, the comments of the judge here are initially less prejudicial than the comments made in *Freeman*. Moreover, like *Freeman*, the court here instructed the jury that: "Neither by these instructions nor by any ruling or remark which I have made do I mean to indicate any opinion as to the facts or as to what your verdict should be." (Illinois Pattern Jury Instructions, Criminal, No. 1.01 (2d ed. 1981) (hereinafter IPI Criminal 2d).) Additionally, like *Freeman*, there is strong evidence of defendant's guilt. While defendant attempts to distinguish *Freeman* on the ground that the jury there was otherwise properly instructed whereas here, as we discuss later, the jury was not, we do not believe the erroneous instructions given in this case operate to distinguish *Freeman*.

Finally, the court's motive in making the comments was to emphasize to the jury that, before it convicts "this defendant," it must be convinced beyond a reasonable doubt that he committed the charged crimes. We do not believe that the jury could reasonably construe the judge's remarks as a statement by the court that the State did not

have to prove beyond a reasonable doubt that a crime was committed. For these reasons, we conclude that defendant has failed to show that he was harmed by the comments and, therefore, reversal is not required. See *People v. Heidorn* (1983), 114 Ill. App. 3d 933, 937, 449 N.E.2d 568, 573.

Defendant next contends that he was denied a fair trial when, (1) during *voir dire*, the trial judge referred to complainant as a "victim," and (2) in instructing the jury, the trial judge used the term "victim" without simultaneously providing the neutral definition for that term provided in IPI Criminal 2d No. 11.66. (Supp. 1989).

The record shows that during *voir dire*, the court read the witness list to the jury. Prior to this reading, the court told the jury the purpose underlying this reading. During this explanation, the court told the jurors that they would not serve if they knew any of the witnesses on the list or if they knew the "victim." It was in this context that the term "victim" was used.

■ We first note that defendant failed to object to the judge's "victim" comment and did not include it within his motion for a new trial. The issue is, therefore, waived. As with defendant's other *voir dire* allegation, however, we treat it under the plain error exception as it arguably pertains to the judge's opinion that complainant was a victim.

As indicated, defendant must show the court's "victim" remark was prejudicial. (*Heidorn*, 114 Ill. App. 3d at 937, 449 N.E.2d at 573.) Here, the evidence is overwhelming that complainant was victimized in this case. Moreover, this case does not involve the defense of consent. In such situation, the complainant's status as a victim is a critical part of the State's burden. Here, defendant's defense involved mistaken identification and, therefore, the fact that complainant was indeed a victim was not readily disputed. Moreover, as previously indicated, the judge gave an instruction that his comments were to be disregarded and that defendant was presumed innocent until proven guilty by proof beyond a reasonable doubt. Finally, the use of the term "victim" served only to distinguish the complainant from the class of other potential witnesses who might testify at trial. For these reasons, we do not believe this isolated remark prejudiced defendant.

■ As for the jury instruction aspect of this contention, defendant notes that the term "victim" is used within the standard jury instruction definitions for "aggravated criminal sexual assault" and "force or threat of force." (See IPI Criminal 2d Nos. 11.33, 11.63 (Supp. 1989).) Defendant claims the court's failure to accompany the above instructions with the neutral IPI definition of "victim" imper-

missibly allowed the jury to assume a fact which the State had the burden of proving beyond a reasonable doubt.

We believe defendant has waived the right to assert this issue on appeal. As the State notes, defendant never objected to the instructions as given, proffered the suggested "victim" instruction, or raised any objection in his post-trial motion. While Supreme Court Rule 451(c) provides that "substantial defects [in jury instructions] are not waived by failure to make timely objections thereto if the interests of justice require" (134 Ill. 2d 451(c)), the interests of justice do not require that an exception be recognized in this case. Under this limited exception, an instructional error can be addressed on appeal where necessary to correct grave errors or when the case is close factually and fundamental fairness requires that the jury be properly instructed. (*People v. Roberts* (1979), 75 Ill. 2d 1, 14, 387 N.E.2d 331, 337.) We do not believe the omission of the definition of "victim" resulted in "grave" error to defendant and, as previously discussed, this is not a factually close case.

*People v. Payne* (1990), 194 Ill. App. 3d 238, 550 N.E.2d 1214, a case relied upon by defendant to avoid the waiver rule, is not factually analogous. There, the defendant was convicted for residential burglary with intent to commit a felony therein. In instructing the jury on this charge, the circuit court failed to provide a definition of the term "felony," a term contained within the principal IPI instruction given in that case. The appellate court found the omission of this definition to be reversible error because defendant's conduct, which the court labelled as "bizarre," raised a serious question as to his intent as it existed upon entering the home. The court opined that without knowing what amounted to felonious behavior, the jury was precluded from determining whether defendant intended to commit a felony.

In this case, and unlike *Payne*, the term "victim" is not an *essential* element of the crimes charged against defendant. Moreover, as previously indicated, defendant never readily disputed that a sexual assault occurred, but rather contested his identification as the perpetrator.

A more factually analogous case is *People v. Tannenbaum* (1980), 82 Ill. 2d 177, 415 N.E.2d 1027. There, defendant was charged with felony theft. The jury was given all instructions necessary for its determination of defendant's guilt or innocence except that no instruction was given on the element of the value of property stolen. The court held that the defendant was not denied a fair trial because of the overwhelming evidence that the stolen property exceeded the statutory amount. We believe *Tannenbaum* closely resembles this

case. Therefore, we conclude that the absence of the victim instruction did not deny defendant a fair trial.

Defendant's next contention concerns IPI Criminal 2d No. 14.04, the standard robbery instruction. The instruction given in this case, which was patterned after the above instruction, provided:

"To sustain the charge of robbery, the State must prove the following propositions:

*First*: That the defendant took United States Currency from the person or presence of A.M.; and

*Second*: That the defendant did so by the use of force or by threatening the imminent use of force.

If you find from your consideration of all the evidence that *this proposition* has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that *this proposition* has not been proved beyond a reasonable doubt, you should find the defendant not guilty." (Emphasis added.)

Defendant contends that this instruction was erroneous because, under the standard jury instruction, the phrase "this proposition" in the third and fourth paragraphs above should be, respectively, "each one of these propositions" and "any one of these propositions." Defendant contends he was denied a fair trial because the instruction, as given, did not require the State to prove each element of the robbery offense beyond a reasonable doubt.

■ As with defendant's other allegations of instructional error, we are again faced with the issue of whether defendant waived the error concerning the robbery instruction. The record reflects that defendant failed to object to the instruction at trial, tender an alternative, or raise the error in his post-trial motion. While this state of the record frequently results in waiver, our supreme court has recognized that certain instructions, such as those pertaining to the burden of proof, the presumption of innocence and the elements of the crime charged, are so central to our constitutional guarantee of a fair trial that the failure to object to their omission does not result in a waiver. (See *People v. Layhew* (1990), 139 Ill. 2d 476, 564 N.E.2d 1232; *People v. Ogunsola* (1981), 87 Ill. 2d 216, 429 N.E.2d 861; *People v. Fierer* (1988), 124 Ill. 2d 176, 529 N.E.2d 972.) As the instructional error here deals with the State's burden of proof as to the elements of robbery, we decline to treat the error as waived and "endeavor to determine whether it denied defendant a fair trial." *Layhew*, 139 Ill. 2d at 486, 564 N.E.2d at 1236.

In *People v. Harvey* (1991), 209 Ill. App. 3d 733, 568 N.E.2d 381, this appellate court faced a factually similar instructional error. There, the jury was first instructed on the elements of murder, and then received the following instruction: "If you find from your consideration of all of the evidence that *these propositions* have not been proved beyond a reasonable doubt, you should find the defendant not guilty." (Emphasis in original.) (*Harvey*, 209 Ill. App. 3d at 739, 568 N.E.2d at 385.) Defendant there contended that the failure to give the pattern jury instructions, which added the words "any one of" before the words "these propositions," prevented the jury from acquitting defendant unless the jury had reasonable doubt as to *all* the murder elements, rather than just one. *Harvey*, 209 Ill. App. 3d at 739, 568 N.E.2d at 385.

On appeal, the court addressed whether the inaccurate instruction denied defendant a fair trial. In concluding it did not, the court placed principal reliance on *People v. Layhew* (1990), 139 Ill. 2d 476, 564 N.E.2d 861. In *Layhew*, the trial judge failed to provide the jury with a written instruction specifically informing it that defendant was presumed innocent until proven guilty beyond a reasonable doubt. (IPI Criminal 2d No. 2.03.) While recognizing the critical importance of this instruction, *Layhew* refused to adopt a *per se* rule which would mandate reversal where such instruction is not given. (*Layhew*, 139 Ill. 2d at 486, 564 N.E.2d at 1236-37.) Rather, in assessing whether a defendant was denied a fair trial in such a situation, *Layhew* adopted a totality of the circumstances approach, which required the court to assess the instructional error in light of " 'all the instructions to the jury, the arguments of counsel, whether the weight of the evidence was overwhelming, and other relevant factors.' " *Layhew*, 139 Ill. 2d at 486, 564 N.E.2d at 1237, quoting *Kentucky v. Whorton* (1979), 441 U.S. 786, 789, 60 L. Ed. 2d 640, 643, 99 S. Ct. 2088, 2090.

Applying the totality test to this case, we note that, prior to *voir dire*, the court imparted to prospective jurors on numerous occasions that defendant was presumed innocent of all charges and that this presumption remained throughout trial until the jury was convinced beyond a reasonable doubt from all the evidence that defendant was guilty. Again, during *voir dire*, the court repeatedly emphasized the State's burden of proof requirement. Later, prior to opening statements, the court reminded the jury of its responsibility to sign a not-guilty verdict as to any and all charges if the State fails its burden of proof. Finally, prior to closing argument, the court reminded the jury that it was the sole arbiter of the facts and of determining whether the State had proven defendant guilty beyond a reasonable doubt.

Regarding jury instructions, several observations can be made. First, the charge pertaining to aggravated criminal sexual assault was given in accordance with IPI Criminal 2d No. 11.34 (Supp. 1989). This instruction informed the jury that all elements were to be proven beyond a reasonable doubt. The language used in this instruction to convey this message to the jury paralleled the language used in the robbery instruction except for the error of which defendant complains. Second, the robbery instruction at issue here began with the language: "To prove the charge of robbery, the State must prove the following *propositions:*" (Emphasis added.) The instruction then sets forth the two elements which must be proven. It is only in the closing aspect of the instruction that the error takes place. Third, the jury received IPI Criminal 2d No. 2.03, which informed the jury of defendant's presumption of innocence and the State's burden of overcoming this presumption by proof beyond a reasonable doubt.

As for the factor addressing counsel's statements, our review of the record indicates that defense counsel in both opening and closing statements reminded the jury of the State's burden of proving defendant guilty beyond a reasonable doubt.

Turning to the burden of proof factor, while we do not wish to undertake a debate as to whether the proof of defendant's guilt was "overwhelming," the evidence is not closely balanced and is clearly sufficient to sustain the robbery conviction. As *Layhew* indicates, overwhelming proof is *not* a prerequisite to affirmance of the verdict. *Layhew*, 139 Ill. 2d at 491, 564 N.E.2d at 1238-39.

After careful review of the totality of the circumstances, we are convinced that, had the jury been properly instructed, the results of the trial would not have been different. Accordingly, we believe the instructional error to be harmless error beyond a reasonable doubt. *Layhew*, 139 Ill. 2d at 492, 564 N.E.2d at 1239.

Defendant's next contention relates to allegedly improper prosecutorial statements made during rebuttal argument. Defendant contends in particular that the prosecutor repeatedly made references to facts not in evidence.

■ We do not reach the merits of this issue as defendant has failed to preserve it for review. The record reflects that, while defendant objected to the comments when made, defendant failed to include any reference to the comments in his post-trial motion. Accordingly, defendant has waived this issue for review. *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1131-32, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.

We also do not believe the plain error doctrine saves this issue. The record reflects that after the alleged improper comments were made, the court sustained defense counsel's statements and instructed the jury to disregard them. The court also reminded the jury to recall the facts. At the close of arguments, the court quickly reminded the jury that counsel's arguments were not evidence but only their belief of what the evidence showed. Finally, the jury also received IPI Criminal 2d Nos. 1.02 and 1.03. These instructions reminded the jury that it was the sole judge of the witnesses' testimony and that any comment by counsel not supported by the evidence was to be disregarded. For these reasons, we do not believe the prosecutor's statements rose to the level of plain error.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed. In light of the dispositions reached on the preceding issues, we do not address defendant's remaining issue that the cumulative effect of all the errors operated to deny him a fair trial.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

MANNING, P.J., and O'CONNOR, J., concur.