2021 IL App (1st) 191368-U

THIRD DIVISION
September 22, 2021

No. 1-19-1368

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 07 CR 6084 (02) |
| | ) | |
| JOSHUA HOSKINS, | ) | Honorable |
| | ) | Joseph M. Claps, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE McBRIDE delivered the judgment of the court.
Justices Ellis and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Third-stage denial of defendant's postconviction claim that appellate counsel provided ineffective assistance by not raising a claim under plain error was not manifestly erroneous where the underlying claim was not meritorious.

¶ 2    Defendant, Joshua Hoskins, was convicted under an accountability theory of attempted first-degree murder, aggravated battery, armed robbery, and aggravated battery with a firearm, and sentenced to 19 years' imprisonment. Thereafter, defendant filed a petition pursuant to the Post-Conviction Hearing Act, arguing, among other things, that his counsel on direct appeal was ineffective for failing to argue for plain error review of his claim that his due process rights were

violated when the trial court failed to conduct a *sua sponte* fitness hearing at sentencing. Following a third-stage hearing on the issue, the trial court denied the petition, finding that defendant failed to show that a constitutional right was violated.

¶ 3    The record shows that defendant was charged by indictment with attempted first-degree murder, aggravated battery, armed robbery, and aggravated battery with a firearm, in connection with the January 14, 2007, robbery and shooting of the victim, Kevin Crain.

¶ 4    Prior to trial, defendant submitted a motion to suppress his statements to the police, arguing that his statements were coerced, and that he was unable to appreciate his *Miranda* rights due to his "physical, physiological, mental, educational, and/or psychological state, capacity, and condition." Defendant's trial counsel requested that the court refer defendant for a behavioral clinical examination (BCX) to determine whether he was able to knowingly waive his *Miranda* rights, and the court agreed. The resulting BCX determined that defendant was capable of understanding the *Miranda* warnings.

¶ 5    At the hearing on defendant's motion, Chicago Police Detective Steven Worsham testified that on February 23, 2007, he spoke with defendant and read him his *Miranda* rights. Defendant indicated that he understood his rights and decided to waive them. Defendant then gave a written statement to Detective Worsham, which he reviewed and signed.

¶ 6    Defendant testified that on February 23, 2007, a correctional officer came to his cell and told him that a counselor wanted to speak to him. He accompanied the officer and was greeted by three police detectives. He told the detectives that he did not want to speak to them without an attorney present, but they continued to interrogate and threaten him. Defendant testified that he was never advised of his *Miranda* rights, and that Detective Worsham promised to secure lenient sentences for his other cases if he confessed. Defendant testified that he did not sign or write any

self-incriminating statement, but he did sign a paper agreeing to serve as a witness for his brother, although he did not read that document.

¶ 7    The court denied defendant's motion.

¶ 8    The facts elicited at defendant's trial were set out in the Rule 23 order from defendant's direct appeal, as follows:

> At trial, Crain testified that on January 14, 2007, he and two friends were driven by his brother, Corey, to 'The Apartment Lounge' at 75th Street and Rhodes Avenue, in Chicago. They arrived around 2 a.m., and after spending about an hour at the club, Crain left alone and sat in his brother's Yukon Denali SUV, which was parked in a lot across the street and at a slight distance from the club.
>
> About 3:30 a.m., he was in the driver's seat listening to the radio when an armed individual opened the passenger side door of the car. This activated the light inside the vehicle, which, in turn, allowed Crain to see the gunman's face. Crain testified that the gunman was a light-skinned, black individual wearing a hat, about 23 or 24 years old, and pointing a .22 caliber gun at him. The gunman said, 'Don't move' and 'put your money on the seat.' Crain jumped out of the car, handed over about $300 from his pocket, and the gunman shot him in the face.
>
> Crain blacked out momentarily, and when he regained consciousness, he was aware of the gunman removing a white gold chain and cross that he was wearing. The gunman shot Crain two more times in the back as he walked away from the car in shock. At the time, Crain observed two black individuals standing close together about two to three feet behind the car. They were moving their heads from right to left, and eventually entered the car and looked through it. Crain made his way back to the club where someone called for help, and he was taken to the hospital by ambulance and remained hospitalized for a week. The doctors were unable to remove the three bullets from his body, one of which had knocked out a tooth.
>
> The State presented additional evidence showing that defendant was arrested on January 16, 2007, along with his brother and Hakim Williams, and that a silver Clerk .22 caliber revolver was recovered in connection with their arrests. Defendant subsequently reviewed and signed a handwritten statement prepared by the assistant State's Attorney wherein he averred, in relevant part, that on January 14, 2007, the two brothers, an individual named Chris, and Hakim (collectively, the Group) were driving around in a 'hype car' and looking to do a 'sting,' *i.e.,* a robbery. Defendant explained that a 'hype car' is rented by giving drugs to a drug user in exchange for the use of the car.
>
> About 3:30 a.m., Hakim drove the hype car to 75th Street and Rhodes Avenue, an area where there were a few clubs that people would be leaving at that time. As they were driving by the intersection, Hakim called out, 'I got one,' meaning that he saw someone to rob, then parked the car at 7523 South Rhodes Avenue where some females that the Group knew resided. From there, the Group

walked to the lot at 7502 South Rhodes Avenue, and the plan was that Hakim would perform the robbery while the others worked 'S,' *i.e.,* security.

Hakim approached the passenger side of a black GMC SUV where a lone individual sat listening to music, while defendant approached the driver's side of the car, and Chris and Johnathon kept a lookout by the taillights. Hakim then entered the car through the passenger side door armed with a silver .22 caliber pistol, and the music volume lowered. Hakim said, 'Give me that s***,' and when the man just looked at him, Hakim shot him in the face. The man reached into his pocket and tossed some money towards Hakim, then opened the driver's side door of the car, stepped out, looked directly at defendant, and handed him the chain from around his neck. As the man was getting out of the car, Hakim shot him twice more in the back.

The Group fled and returned to the hype car where they split up the $50 Hakim took from the man, with defendant and Hakim each taking $20, Johnathon taking $10, and Chris receiving nothing. Defendant gave the chain to either Chris or Johnathon. The Group then dropped off the hype car at 55th and State Streets near a KFC restaurant, and Hakim informed 'the hype' of its location.

The court ultimately found that defendant's statement was corroborated by the testimony of Crain, then found defendant guilty of attempted first degree murder, aggravated battery with a firearm, armed robbery, and aggravated battery." *People v. Hoskins*, 2011 IL App (1st) 100065-U, ¶¶ 4-11.

¶ 9    This court also previously described the post-trial and sentencing proceedings. Specifically, on September 15, 2009, about one month after trial,

"defense counsel informed the court that she received a call from the probation officer who had arrived to interview defendant for his presentence investigation report (PSI), and that the officer told her that it appeared that defendant was not taking his medication and refused to participate in the PSI. At counsel's request, the court ordered a fitness examination of defendant.

On October 6, 2009, counsel acknowledged that two separate reports indicated that defendant was fit for sentencing, and the court ordered another PSI at counsel's request. The record shows that one of the fitness reports indicated that defendant was fit for sentencing with medication, and that the second PSI was completed without incident. On November 2, 2009, counsel informed the court that she had received the PSI, reviewed it with defendant, and was not requesting any additions, corrections, or deletions, except for a typographical error.

At defendant's sentencing hearing on November 24, 2009, the State argued in aggravation that defendant's criminal history was 'very violent in nature' and that he was 'a danger to society.' In mitigation, defense counsel stated, *inter alia*, that 'there is a long history of mental illness. Certainly that has been addressed during, in pretrial, even post trial, your Honor, there was a BCX performed, and he was found fit for sentencing.' Counsel also noted, 'I can attest to the fact that [defendant] has never been disrespectful to me.' The court then offered defendant an opportunity to speak, which he declined by saying, 'No, sir.' After merging

4

defendant's aggravated battery convictions, the court sentenced him to concurrent terms of 19 years' imprisonment on his attempted first degree murder, aggravated battery with a firearm, and armed robbery convictions." *Id. at* ¶¶ 12-14.

¶ 10 In defendant's direct appeal, this court first rejected defendant's argument that the State failed to establish the *corpus delicti* to his accountability for the crimes he was convicted of, concluding that, in addition to defendant's confession, there was independent evidence that "established the shooting and the robbery which corroborated the details of defendant's confession and inspired belief in it." *Id.* at ¶¶ 16-21. Defendant next argued that the trial court erred when it failed to hold a *sua sponte* fitness hearing during his sentencing. *Id.* at ¶ 22. Specifically, he claimed that the court learned that he had not been taking medication prior to the sentencing hearing, and that he was only found fit for trial with medication. Accordingly, defendant maintained that the court should have had a *bona fide* doubt as to his fitness, and the court's failure to hold another fitness hearing required reversal of his sentence. *Id*. This court rejected this argument without reaching the merits, finding the issue was forfeited where defendant's trial counsel did not file a motion to reconsider the court's sentence, and where defendant did not argue that the court committed plain error. *Id.* at ¶ 24.

¶ 11 Thereafter, defendant filed a petition pursuant to the Post-Conviction Hearing Act. Defendant first argued that he was denied the effective assistance of trial counsel, where trial counsel declined to file a motion to reconsider his sentence, failing to preserve "the entire issue of his fitness for sentencing" for appeal. Defendant argued that there was "no rational strategic reason underlying the decision not to file the motion to reconsider," and that the decision deprived him of the opportunity to appeal. Second, defendant argued that his appellate attorney provided ineffective assistance of counsel for failing to raise an ineffective assistance of counsel argument on appeal based on trial counsel's failure to submit a motion to reconsider his sentence, and for

failing to argue that the trial court committed plain error by failing to hold a *sua spone* fitness hearing. Finally, defendant argued that he was deprived of his right to due process of law when the trial court failed to conduct a *sua sponte* fitness hearing during his sentencing hearing.

¶ 12    The State moved to dismiss the petition, arguing that it was defective because defendant failed to verify the document, and that his ineffective assistance of both trial and appellate counsel arguments were meritless where several BCXs found him fit for trial and sentencing. The State further argued that defendant's argument that his due process rights were violated was inconsistent with the record.

¶ 13    The trial court denied the State's motion to dismiss and held an evidentiary hearing on the petition. At that hearing, defendant called his trial counsel, who testified that she chose not to file a motion for the court to reconsider its sentence. Trial counsel explained that she calculated that the statutory minimum sentence was 21 years' imprisonment, and the court sentenced defendant to 19 years. Trial counsel decided that the risk of alerting the court to its error by filing a motion to reconsider defendant's sentence was not worth the potential benefit of filing such a motion.

¶ 14    Trial counsel further testified that she never had any trouble communicating with defendant during trial or sentencing, and that defendant always cooperated with her. She acknowledged that there was an occasion when defendant "didn't cooperate with the probation department" when they initially attempted to conduct an interview for his PSI, but after that occasion, the PSI was completed and a BCX confirmed that defendant was fit to be sentenced with medication. Trial counsel testified that defendant did not appear to have any cognitive difficulties during the sentencing hearing and seemed to know what was going on. During the sentencing phase of proceedings, trial counsel spoke to defendant about whether he was taking his medication, and based on that conversation, she believed that he was. To her knowledge, defendant was taking his

medication as-prescribed during both trial and sentencing. Trial counsel testified multiple times that she had "no doubt" about defendant's fitness during sentencing. In response to questioning by defendant's postconviction counsel, trial counsel acknowledged that she never specifically checked with the Cook County Jail or Cermak Hospital to see if defendant was taking his medication, explaining that she found no reason to believe that he was not.

¶ 15 Defendant and the State then stipulated to the testimony of defendant's appellate counsel, who represented defendant during his appeal. Appellate counsel had determined that defendant risked incurring a longer term on appeal because the trial judge had not imposed a 15-year firearm enhancement and did not run his convictions consecutively. Appellate counsel explained this to defendant, and defendant signed a declaration acknowledging that he understood the risks of pursuing an appeal. Furthermore, appellate counsel reviewed the file and transcripts from defendant's case, and chose not to pursue an ineffective assistance of counsel argument on appeal because she found that it would not be viable.

¶ 16 Following the presentation of the above evidence, defendant's postconviction counsel argued that, although defendant told trial counsel that he was taking his medication, trial counsel should have nevertheless confirmed that fact with either the jail or the hospital. Defendant's postconviction counsel further argued that trial counsel's decision to not file a motion to reconsider prevented review of defendant's sentence on appeal. During argument, defendant's postconviction counsel also discussed certain medical records that were attached to defendant's postconviction petition. Counsel acknowledged that the records indicated that a nurse "sign[ed] off on these medications" but stated that the defense had been unable to contact that nurse. Counsel further argued that without confirming with the nurse, there was "no way to know whether or not they actually watch each individual take and swallow those medications."

7

¶ 17    In response, the State pointed out that it was defendant's burden to show that the medication was not given to him, and, to the contrary, the records indicated that defendant was prescribed and given the appropriate medication. Accordingly, the State argued that defendant was not prejudiced by any alleged deficiency of counsel. Because there was no evidence to support defendant's claim that he had not taken his medication, there was no reason to believe a motion to reconsider defendant's sentence would be successful.

¶ 18    The court denied the petition. Defendant filed a timely notice of appeal, and in this court, defendant contends that the court erred in denying his petition because "appellate counsel was ineffective for failing to argue for plain error review of [defendant]'s claim that his due process rights were violated when the trial court failed to conduct a *sua sponte* fitness hearing at sentencing, leading to forfeiture of that issue." Because defendant has concentrated his arguments solely on this claim, we initially note that he has abandoned the remaining claims set forth in his amended postconviction petition and forfeited them for review. Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008); *People v. Guest*, 166 Ill. 2d 381, 414 (1995).

¶ 19    The Illinois Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 through 122-8 (West 2016)) provides a three-step procedural mechanism by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution, the Illinois Constitution, or both. 725 ILCS 5/122-1(a) (West 2016); *People v. Harris,* 224 Ill. 2d 115, 124 (2007); *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Postconviction relief is limited to constitutional deprivations that occurred at the original trial. *Coleman*, 183 Ill. 2d at 380. "A proceeding brought under the [Post-Conviction Act] is not an appeal of a defendant's underlying judgment. Rather, it is a collateral attack on the judgment." *People v. Evans*, 186 Ill. 2d 83, 89 (1999).

¶ 20    Under the Act, a defendant bears the burden of establishing that a substantial deprivation of his constitutional rights occurred. *People v. Waldrop,* 353 Ill. App. 3d 244, 249 (2004). At the first stage, a postconviction petition may be summarily dismissed if the claims in the petition are frivolous and patently without merit. *People v. Hodges,* 234 Ill. 2d 1, 10 (2009); see 725 ILCS 5/122–2.1(a)(2) (West 2016). However, if the petition survives initial review, the process moves to the second stage, where the circuit court appoints counsel for the defendant when the defendant cannot afford counsel. 725 ILCS 5/122–4 (West 2016). Appointed counsel then has an opportunity to amend the defendant's *pro se* postconviction petition. See *People v. Slaughter,* 39 Ill. 2d 278, 284–85 (1968). The State may then file a motion to dismiss or an answer to the postconviction petition. 725 ILCS 5/122–5 (West 2016). Taking all well-pleaded facts as true at the second stage, (*Wheeler,* 392 Ill. App. 3d at 308), the circuit court determines whether the petition and any accompanying documentation make a substantial showing of a constitutional violation (*People v. Edwards,* 197 Ill. 2d 239, 246 (2001)).

¶ 21    If, like here, the petition advances to the third stage for an evidentiary hearing, the defendant bears the burden of making a substantial showing of a deprivation of constitutional rights at that hearing. *People v. Coleman,* 206 Ill. 2d 261, 277 (2002). During a third-stage evidentiary hearing, the defendant may present affidavits, depositions, testimony, or other evidence to meet that burden. 725 ILCS 5/122-6 (West 2016). At the conclusion of the hearing, the court "determines whether to grant or deny the relief requested in the petition." *People v. Ramirez*, 162 Ill. 2d 235, 239 (1994).

¶ 22    The parties disagree about the applicable standard of review. Defendant asks this court to review the denial of his claim under the *de novo* standard, "because no credibility or factual determinations were necessary for the trial court to rule on his post-conviction claim." The State,

however, contends that this court should apply a manifest error standard of review because the court considered the live testimony of trial counsel, and because the judge was the same judge who presided over defendant's trial and thus had a unique familiarity with issues related to defendant's fitness during the sentencing proceedings.

¶ 23    Our supreme court has explained that the trial court's denial of a post-conviction petition after an evidentiary hearing is subject to *de novo* review if the issues presented are pure issues of law—specifically, where the circuit court heard no new evidence, and where the judge presiding over the hearing did not preside over defendant's trial. *People v. English*, 2013 IL 112890, ¶ 24. However, this court reviews the denial under a manifest error standard of review if the trial court made factual findings or credibility determinations, (*id.*, ¶ 23), or if the trial court had "some special expertise or familiarity with defendant's trial or sentencing and that familiarity had some bearing on the disposition of the postconviction petition." (*People v. Carter*, 2017 IL App (1st) 151297, ¶ 132).

¶ 24    In this case, the circuit court considered live testimony from trial counsel, who represented defendant during the trial and sentencing proceedings, and testified that she had no reason to believe he was not on his medication during his sentencing hearing. Additionally, the judge who heard defendant's post-conviction petition was the same judge who presided over defendant's trial and sentencing. In these circumstances, the judge would have a unique familiarity with the issues surrounding defendant's fitness and understanding of the proceedings. The trial court had the opportunity to observe defendant's behavior and demeanor throughout his pretrial motions, trial, sentencing hearing, and post-conviction hearings. In these circumstances, we will assess the court's decision under the manifest error standard of review. A decision is manifestly erroneous only if it contains an error that is clearly evident, plain, and indisputable. *People v. Hatchett*, 2015

IL App (1st) 130127, ¶ 26.

¶ 25    Defendant contends that his appellate counsel was ineffective for failing to argue for plain error review of his claim that the trial court erred in failing to conduct a *sua sponte* fitness hearing. Claims of ineffective assistance of appellate counsel are measured against the same standard as those dealing with ineffective assistance of trial counsel. *People v. Childress*, 191 Ill. 2d 168, 175 (2000). A petitioner who contends that appellate counsel rendered ineffective assistance of counsel must show that the failure to raise an issue on direct appeal was objectively unreasonable and that the decision prejudiced petitioner. *People v. West,* 187 Ill.2d 418, 435 (1999).

¶ 26    In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If a case may be disposed of on the ground of lack of sufficient prejudice, that course should be taken, and the court need not ever consider the quality of the attorney's performance. *Strickland*, 466 U.S. at 697. "*Strickland* requires actual prejudice be shown, not mere speculation as to prejudice." *People v. Bew*, 228 Ill. 2d 122, 135 (2008). Unless the underlying issue is meritorious, petitioner suffered no prejudice from counsel's failure to raise it on direct appeal. *West,* 187 Ill.2d at 435. We, therefore, must determine whether defendant's underlying claim—that the court committed plain error in failing to *sua sponte* conduct a fitness hearing—would have been successful if raised on direct appeal.

¶ 27    Regarding the merits of his underlying claim, defendant contends that a *bona fide* doubt of his fitness existed "when the trial court learned that [defendant] had been refusing to take his psychotropic medication, [and] had been disruptive and uncooperative with the jail staff and a probation officer who was attempting to interview him for a PSI."

11

¶ 28     A person is presumed to be fit to stand trial and be sentenced, and is only unfit if, because of his physical or mental health, he is unable to understand the nature and purpose of the proceedings against him, or to assist in his own defense. 725 ILCS 5/104-10 (West 2016). If a person is prescribed psychotropic drugs, the court should not find the defendant unfit solely by virtue of receiving those drugs or medications. 725 ILCS 5/104-21(a) (West 2016). A court is required to stop proceedings and order a fitness determination only when there is "a *bona fide* doubt of the defendant's fitness" 725 ILCS 5/104-11(a) (West 2016). The court should look to (1) the defendant's behavior, (2) the defendant's demeanor at trial, (3) any prior medical opinion on the defendant's competence, and (4) any representations by defense counsel on the defendant's competence. *People v. Brown*, 236 Ill. 2d 175, 186-87 (2010) (citing *People v. Eddmonds*, 143 Ill. 2d 501, 518 (1991)). Whether a *bona fide* doubt exists is generally a matter within the trial court's discretion. *People v. Brown*, 2020 IL 125203, ¶19. "The correct test for evaluating prejudice in these situations is whether a reasonable probability exists that, if defendant would have received the *** fitness hearing to which he was entitled, the result of the proceeding would have been that he was found unfit to stand trial." *People v. Mitchell*, 189 Ill.2d 312, 334 (2000).

¶ 29     In the present case, there is no evidence that the trial court had, or should have had, a *bona fide* doubt of defendant's fitness, or his ability to understand the proceedings or assist in his defense at sentencing. Over the course of the proceedings, defendant was given several fitness examinations, each concluding that defendant was either fit for trial, fit for sentencing, or fit for sentencing with medication. The only time that the court was told that defendant did not take his medication was at a status hearing, several hearings before defendant was ultimately sentenced. However, at the subsequent sentencing hearing, defendant came to court with a fully completed and reviewed PSI. Trial counsel testified that she spoke to defendant about whether he was taking

his medication and believed that he was doing so based on that conversation and her observations of his behavior. Trial counsel repeatedly testified that she had "no doubt" as to defendant's fitness. Moreover, the trial court, having observed defendant throughout the trial and sentencing proceedings, did not express any concerns about defendant's behavior or understanding of the proceedings. Our review of the record also indicates that defendant was responsive and coherent, and appeared able to follow the proceedings. Therefore, even if defendant's appellate counsel had requested plain error review of this issue, it would not have been successful.

¶ 30    Although defendant may have not taken his medication on one occasion, out of court, weeks before he was sentenced, there is no evidence that he was unmedicated at the time of sentencing.  Although defendant claimed in his postconviction petition that he was not taking his medication, he chose not to testify at the third stage hearing, where the veracity of that statement could be tested. Unlike in the first and second stages of postconviction proceedings, the court does not simply take all "well-pleaded facts as true" at the third stage. During a third stage evidentiary hearing, defendant has the opportunity to put forth evidence, and defendant bears the ultimate burden of making a substantial showing of a constitutional violation. We find no manifest error in the trial court's conclusion that defendant failed to meet that burden here.

¶ 31    We find defendant's reliance on *People v. Jackson*, 57 Ill. App. 3d 809 (1978), unpersuasive. Prior to sentencing in *Jackson*, the trial court expressed concern regarding the defendant's fitness and ordered a fitness examination be conducted and submitted to the court at the sentencing hearing. Thereafter, at the sentencing hearing, the trial court was informed that no such examination had been conducted, and that the defendant had not been given the medication that was necessary to maintain his fitness. Notwithstanding, the court proceeded to sentencing. *Id.* at 814. In those circumstances, this court found the existence of *bona fide* doubt of defendant's

fitness at sentencing.

¶ 32    The facts of this case are clearly distinguishable from those in *Jackson*. While the trial court in *Jackson* was clearly and expressly informed that the defendant was not on his medication at the time of his hearing, there is no evidence here that defendant was unmedicated during the sentencing hearing, as described above. Additionally, there is no indication that the trial court expressed similar doubt regarding defendant's fitness, and the court did not order an examination of defendant that had not been conducted at the time of the hearing. To the contrary, the court in this case ordered a BCX at defense counsel's request, and that examination indicated that defendant was fit for sentencing with medication.

¶ 33    Accordingly, we find no manifest error in the circuit court's denial of defendant's petition at the third stage of postconviction proceedings, where the defendant failed to make a substantial showing that he was denied effective assistance of appellate counsel.

¶ 34    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 35    Affirmed.